ATLANTA SHIPPING CORPORATION, INC., Plaintiff,

v.

CHEMICAL BANK, Defendant.

No. 84 Civ. 8862 (GLG).

United States District Court, S.D. New York.

March 25, 1986.
As Amended March 26, 1986.

336

Michael P. Arra, New York City, for plaintiff.

Zalkin, Rodin & Goodman, New York City, for defendant; Richard S. Toder, Andrew D. Gottfried, William H. Schrag, of counsel.

GOETTEL, District Judge:

In June 1976, plaintiff Atlanta Shipping Corporation ("Atlanta"), a Liberian corporation then engaged principally in the business of shipping, entered into a shipping contract with International Modular Housing, Inc. ("IMH"), a Delaware corporation that was then engaged in the business of purchasing modular homes in the United States, shipping them to Saudi Arabia, and selling them there. Under the terms of the shipping contract, referred to in the trade as a Liner Booking Note, Atlanta agreed to carry 560 mobile homes from the United States to Saudi Arabia in four voyages. The Liner Booking Note provided for freight charges of $1.54 million per voyage.

The first of the four contracted voyages was completed and paid for as provided for in the Liner Booking Note. Problems began with the second voyage. IMH paid the first three installments for this voyage, but

did not pay the fourth. At about the same time that IMH missed this installment, it also failed to pay the first installment of the third voyage.

By the spring of 1977, IMH owed Atlanta $2,222,393, in principal and interest. IMH gained a reprieve when, on February 22, 1977, it entered into a "Credit Agreement" with Atlanta, which restructured IMH's indebtedness to Atlanta and gave Atlanta title, possession, and a security interest in 141 homes then aboard an Atlanta ship. IMH also executed a promissory note reflecting its obligations to Atlanta. Atlanta then discharged the cargo and relinquished its possessory maritime lien.

The reprieve was short-lived, for, shortly thereafter, IMH brought an action in state court to enjoin enforcement of the credit agreement, claiming it had been entered into under economic duress. Atlanta removed that action to federal court, commenced an action against IMH in this Court to enforce collection of the promissory note, and served notice of arbitration upon IMH to enforce collection of the amounts due to Atlanta pursuant to the Liner Booking Note. On September 30, 1982, and March 14, 1983, after years of arbitration and litigation, this Court confirmed arbitration awards against IMH and in favor of Atlanta in the respective amounts of $2,012,500 and $1,753,572. Nearly the entire amount of these judgments remains unsatisfied.[1]

This is one of several actions commenced by Atlanta in an effort to recover on its unsatisfied judgments.[2] The defendant, Chemical Bank ("Chemical"), was IMH's primary lender and creditor almost from IMH's formation.

A variety of motions are before the Court. The defendant first challenges the Court's subject matter jurisdiction. It also moves to dismiss a number of the causes of

---

**1.** Atlanta has recovered only $3,834.68 on these judgments. In one of the Atlanta actions, the Court awarded IMH $25,000 against Atlanta as a discovery sanction. Thus, the amount due and owing by IMH to Atlanta is $3,737,237.32, plus interest.

**2.** The other actions are *Atlanta v. Waldron,* 82–3081 (GLG) brought against the officers, directors, and stockholders of IMH, and *Atlanta v. Cross & Brown,* 84–2454 (GLG).

action in the plaintiff's thirteen count, blunderbuss amended complaint, or, in the alternative, for summary judgment on many of Atlanta's claims. Finally, it seeks an order requiring Atlanta to post security for costs. For the reasons stated below, these motions are granted in part and denied in part.

## I. *Background*

### A. The Factual Background

The amended complaint relates the following pertinent facts, which we take as true, at least for purposes of evaluating the motions to dismiss. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957).

IMH was organized under the laws of the state of Delaware on March 15, 1976. At inception, it had four shareholders. Robert Waldron, its president and also a director, owned 35% of IMH's shares. Frank Visconti, its vice-president, owned 15% of IMH until 1978, when he transferred his shares to Waldron. DIC Concrete Corporation ("DIC"), and Underhill Construction Corporation ("Underhill"), both New York corporations, each owned 25% of IMH. DIC and Underhill and certain of their associated corporations and individuals were allegedly coventurers in a joint venture ("the joint venture").

On March 15, 1976, IMH established a bank account with Chemical Bank in New York. On the same day, the joint venture paid $125,000 into this account. In return, it received 50% of IMH's stock, 25% of which was issued to Underhill and 25% to DIC. Waldron was granted 50% of the stock without payment of any cash consideration. He then issued 15% to Visconti.

In October 1976, DIC and Underhill each borrowed $1.5 million from Chemical Bank, pledging their assets as security. DIC and Underhill then lent the $3 million to IMH. In exchange, each received notes and a chattel mortgage on 103 of IMH's modular homes. The amended complaint alleges that DIC and Underhill's loans, and its

subsequent guarantees (discussed below) actually supplied IMH with equity.

By December 1976, IMH needed additional cash. To enable IMH to obtain the needed funds, DIC and Underhill guaranteed an additional $3 million in Chemical loans to IMH. Thus, as of the end of December 1976, Chemical had loaned $3 million and DIC and Underhill had each loaned $1.5 million to IMH.

On January 10, 1977, DIC, Underhill, IMH, and Chemical agreed to realign their respective obligations. DIC and Underhill agreed to guarantee still another $3 million loan by Chemical to IMH. Chemical, DIC, and Underhill understood that IMH would use this $3 million to repay DIC and Underhill. DIC and Underhill would then repay Chemical. At the end of this realignment, IMH owed Chemical $6 million. Including its obligations to Chemical, IMH's total debt as of January 1977 was $14 million. Its equity was $125,000.

The amended complaint alleges that, at the time of these transactions, Chemical was intimately familiar with the financial history, and business workings of IMH, DIC, Underhill, and their principals. Thus, Chemical allegedly knew that it was lending to a severely undercapitalized or insolvent corporation.

Between January 1977 and March 1980 (during the ongoing dispute between IMH and Atlanta), IMH attempted, with some difficulty to sell its modular homes in Saudi Arabia. During that time, DIC and Underhill made loans to IMH to enable it to service its debt to Chemical. Chemical also accommodated IMH by continually renewing and extending the due dates of the promissory notes evidencing IMH's obligations to Chemical. Chemical monitored IMH's sales, assets, and general finances, conditioning its extensions on the receipt of the proceeds of IMH's sales. Whenever IMH's outstanding debt was reduced, Chemical would forward a renewal note to DIC or Underhill reflecting the reduction and further extending IMH's repayment schedule.

On February 7, 1980, Chemical forwarded a renewal note to IMH extending the loans for 60 days and requesting $205,381 to cover interest to that date. IMH did not make the requested payment. A little more than a month later, IMH sold all of its remaining inventory in Saudi Arabia for $2,450,000. IMH deposited the proceeds of that sale in its account at Chemical. On March 12, 1980, Chemical debited IMH's account $2,150,000 out of the proceeds of the sale. The next day, Chemical advised DIC and Underhill of this set-off and demanded payment under their guarantees of the $600,000 that IMH still owed it plus $247,510.07 in interest that had accrued as of March 12, 1980. On or about April 3, 1980, DIC and Underhill made the requested payment. Chemical then assigned them its interest and rights as a creditor of IMH.

### B. History of this Action

On October 11, 1984, several of Atlanta's creditors filed an involuntary petition pursuant to 11 U.S.C. § 303 (1982) for relief against Atlanta under Chapter 7 of Title 11 of the Bankruptcy Code, 11 U.S.C. §§ 701–66 (1982) ("the Code"). Atlanta filed its original, eleven count complaint in this action on December 11, 1984. On December 20, 1984, Atlanta answered the involuntary petition by filing a voluntary petition thereby converting the case to a proceeding under Chapter 11 of the Code. *See* 11 U.S.C. § 706(a) (1982). After Chemical moved against the complaint in early-April 1985, Atlanta served and filed its thirteen count amended complaint. Chemical subsequently requested that the Court deem its motion to relate to the plaintiff's amended complaint.

### C. The Amended Complaint

The amended complaint purports to state thirteen causes of action. Some of these causes of action contain as many as five claims. Others are so confused as to defy comprehension. As best we can understand the amended complaint, it states the following claims.

The first, third, ninth, tenth, and eleventh causes of action allege, in whole or in part, that IMH fraudulently conveyed assets to Chemical in violation of sections 273, 273–a, 274, 275, and 276 of the New York Debtor and Creditor Law N.Y.Debt. & Cred.Law §§ 273, 273–a, 274, 275 & 276 (McKinney Supp.1986) [hereinafter "D.C.L. § ———"], the common law of New York, and the law of admiralty. The first count cause of action asserts that Chemical, in exercising the $2.15 million set-off, in loaning $6 million to IMH, and in accepting each repayment of those loans, knowingly received a fraudulent conveyance. The third cause of action restates the claim that the set-off was a fraudulent conveyance. The ninth cause of action asserts that Chemical's loans to IMH were actually capital contributions. Thus, every repayment of those loans constituted a conveyance of IMH assets without fair consideration in violation of both the D.C.L. and sections of New York's Business Corporation Law referenced below. The tenth cause of action states that every renewal of the promissory notes and every payment pursuant to those renewals constituted fraudulent conveyances in violation of all of the aforementioned provisions. The eleventh cause of action states that should Chemical receive the proceeds from the sale of the 141 modular homes in which Atlanta had a security interest, that too will constitute a fraudulent conveyance. Moreover, according to the eleventh cause of action, the transfer of those proceeds violates Article 9 of the Uniform Commercial Code.

The fourth cause of action states three separate aiding and abetting claims. It charges Chemical with aiding and abetting (1) fraudulent conveyances by various IMH directors and/or stockholders, (2) improper transfers of assets by directors of IMH in violation of section 720 of New York's business corporation law, N.Y.Bus.Corp.Law § 720 (McKinney 1963) [hereinafter "B.C.L. § ———"], and (3) distributions to stockholders in violation of sections 510 and 719 of the same law.

The second, third, and seventh causes of action all appear to allege claims against

Chemical for receiving preferential transfers. The second reads, "each and every payment of principal and interest made by IMH on the aforementioned $6 million in loan obligations to Chemical Bank was in violation of the ... common law of the State of New York, which prohibits [sic] preferential transfers by insolvent corporations." Amended Complaint ¶ 104. The third cause of action contains a similar allegation about the set-off. The seventh cause of action states that the set-off and IMH's other payments of principal and interest violated "the Admiralty Laws of the United States and the common law of the State of New York which prohibits preferential transfers by an insolvent corporation to or [sic] the benefit of insider beneficiaries." Amended Complaint ¶ 126.

The fifth, sixth, and eighth causes of action defy easy characterization. The fifth charges that Chemical breached a duty of fair dealing to IMH's other creditors by exercising the set-off. The sixth cause of action alleges that Chemical so controlled IMH, DIC, and Underhill that it had a fiduciary duty to IMH's creditors. By recovering payments of principal and interest, including the set-off, Chemical allegedly breached that duty. The eighth cause of action alleges that Chemical is liable as a coventurer of DIC and Underhill and/or IMH for the debts of the latter. The twelfth cause of action seeks punitive damages and attorney's fees, while the thirteenth requests a variety of equitable remedies. Chemical moves to dismiss or, in the alternative, for summary judgment on each of these claims.

## II. *Discussion—Part I*: Motion to Dismiss for Lack of Subject Matter Jurisdiction

Atlanta asks this Court to entertain this action pursuant to its admiralty and diversity jurisdiction. Chemical argues that the Court has neither. Although we find that this matter is not within this Court's admiralty jurisdiction, the plaintiff has convinced us that we have diversity jurisdiction. The defendant's motion to dismiss

for lack of subject matter jurisdiction is, therefore, denied.

### A. Admiralty Jurisdiction

■ Section 1333 of Title 28 of the United States Code establishes the admiralty jurisdiction of the federal courts. That section provides, in pertinent part, that "[t]he district courts shall have original jurisdiction, exclusive of the courts of the States, of: (1) Any civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled." 28 U.S.C. § 1333 (1982).

Although the admiralty jurisdiction has been generally limited to cases involving "the primary operational and service concerns of the shipping industry," G. Gilmore & C. Black, *The Law of Admiralty* 22 (2d ed. 1975), a more expansive line of cases appears to invest the admiralty courts with jurisdiction over some actions that seek to enforce judgments obtained in admiralty. *Id.* at 41–43. The plaintiff relies on *Lee v. Thompson*, 15 F.Cas. 233 (C.C.D.La.1878) (No. 8,202) ("*Lee*"), which it believes is the strongest of this expansive line, to support its argument that this action is within the Court's admiralty jurisdiction. Neither *Lee*, nor the other cited cases, justify the Court's invoking its admiralty jurisdiction in this case.

After the libelant (plaintiff) in *Lee* unsuccessfully attempted to execute against the defendant on a judgment in admiralty, he brought a supplementary action against two of the defendant's judgment debtors. They, in turn, claimed that the defendant had assigned their debts to another. The libelant challenged the purported transfer whereupon the district court found the transfer fraudulent and void and directed the plaintiff to recover from the two judgment debtors. The transferee appealed, contesting the district court's admiralty jurisdiction over the dispute. Affirming, the Court of Appeals stated that absent jurisdiction to hear the plaintiff's claim, "its jurisdiction would often be defeated." *Id.* at 235. The Court elaborated,

[t]he power of the court to entertain such contestations upon all seizures made under its authority would seem to be indispensable.... It seems to me that the proposition can hardly be questioned. Without power to try the validity of conflicting claims, the court could not enforce its judgments for the payment of money. They could always be defeated by fraudulent and simulated transfers.

*Id.* The federal courts remain free to assert their admiralty jurisdiction in order to safeguard the integrity of their judgments in admiralty. *Olav Ringdals Tankrederi v. Ocean Carriers Corp.,* 1964 Am.Mar. Cas. 1581, 1582 (S.D.N.Y.1964). Thus, for example, "the jurisdiction of a court of admiralty to determine [whether a defendant is the] *alter ego* [of a judgment debtor] is 'undoubted.'" *North East Shipping Corp. v. Government of Pakistan,* 1974 Am.Mar.Cas. 900, 904 (S.D.N.Y.) (Magistrate's report), *aff'd,* 1974 Am.Mar.Cas. 908 (S.D.N.Y.1974). *See also Swift & Co. Packers v. Compania Colombiana Del Caribe,* 339 U.S. 684, 70 S.Ct. 861, 94 L.Ed. 1206 (1950) (admiralty court could decide whether transferee of a ship that was attached in admiralty was the alter ego of the transferor). We expect that the power of an admiralty court extends to adjudicating whether a judgment debtor fraudulently conveyed assets to avoid an admiralty judgment.

*Lee, Swift & Co.,* and their progeny expand the admiralty jurisdiction to include actions involving calculated attempts to avoid the judgments or jurisdiction of the admiralty courts. They do not invite the expansion of the admiralty jurisdiction into a blanket means to adjudicate every lawsuit that relates to an admiralty claim or judgment. *See Swift & Co., supra,* 339 U.S. at 690, 70 S.Ct. at 865–66 ("Unquestionably a court of admiralty will not enforce an independent equitable claim merely because it pertains to maritime property."). In determining whether this is an appropriate instance for exercising our admiralty jurisdiction, we must consider both the need to protect the jurisdiction of the admiralty courts and the obvious necessity of preventing its unwarranted expansion.

In this case, the balance falls convincingly on the side of limiting the unwarranted expansion of the admiralty jurisdiction. The amended complaint does not and can not allege that IMH's allegedly fraudulent transfers to Chemical were an attempt to avoid an admiralty judgment. Indeed, when Atlanta finally obtained a judgment against IMH, Chemical had long since ceased doing business with IMH. The plaintiffs have not alleged that IMH's transfers to Chemical were a calculated attempt to avoid our admiralty jurisdiction. Indeed, such an allegation would amount to little more than speculation, not the stuff upon which this Court may rest its admiralty jurisdiction. Nor does the plaintiff allege that Chemical is the alter ego of IMH. The cases involving claims against the alter ego of a defendant in admiralty do not control. In short, this Court need not exercise jurisdiction over this action in order to preserve its admiralty jurisdiction against fraud. By contrast, were we to entertain this action, an admittedly calculated effort to recover on unsatisfied judgments from a deep-pocket defendant, pursuant to our admiralty jurisdiction, we would set a dangerous precedent for hopelessly expanding the admiralty jurisdiction.

■ Even a court possessed with admiralty jurisdiction, may refrain from its exercise when no federal statutory tort claims are raised. *Swift & Co., supra,* 339 U.S. at 695, 70 S.Ct. at 868. Had we admiralty jurisdiction, we would, nevertheless, decline its exercise.

### B. Diversity Jurisdiction

The defendant, a New York corporation, also contends that the Court lacks diversity jurisdiction under 28 U.S.C. § 1332(a) (1982). It rests this contention on 28 U.S.C. § 1332(c) (1982), which states, that for purposes of section 1332, "a corporation shall be deemed a citizen of any State by which it has been incorporated and of the State where it has its principal place of business..." Chemical asserts that sec-

tion 1332(c) applies to alien corporations like Atlanta, a Liberian corporation. Atlanta is also alleged to have its principal place of business in New York. Atlanta vigorously contests the applicability of § 1332(c) to alien corporations, and the defendant's assertion that New York is Atlanta's principal place of business.

■ Whether section 1332(c) applies to alien corporations is a matter of considerable dispute within this circuit. *See Rubinfield v. Bahama Cruise Line, Inc.*, 613 F.Supp. 300 (S.D.N.Y.1985) (surveying the case law).[3] In any event, the courts only apply section 1332(c) to alien corporations whose principal place of business worldwide is one of the United States. *Arab International Bank & Trust Co. v. National Westminster Bank Ltd.*, 463 F.Supp. 1145, 1147 (S.D.N.Y.1979). Atlanta is not such a corporation. Section 1332(c) does not, therefore, apply.

■ In its original complaint, Atlanta alleged that it was a Liberian corporation with a principal place of business in Monte Carlo, Monaco. The defendant asserts that by maintaining a document storage center in New York, and by actively litigating its claims against IMH here, Atlanta made New York its world-wide, principal place of business. In our view, a litigation warehouse does not a principal place of business make. If it did, Atlanta could have created diversity by moving its storage facility across the river to New Jersey. Such obvious irrelevancies should not be conclusive as to the court's subject matter jurisdiction. Atlanta's litigation is also inconsequential. Although a law firm might litigate its way into citizenship, two or three lawsuits cannot do the trick. Moreover, since Atlanta has brought actions in courts throughout the United States, we would have to measure the size of each litigation before determining Atlanta's principal place of business. The absurdity of such a calculation negates the contention that a business enterprise may litigate its way into citizenship.

As of December 1984,[4] Atlanta had ceased its operations in the shipping business. Its primary activity was the litigation of its outstanding claims, including those against IMH. (It had yet to file for bankruptcy.) Atlanta's president, J.G. Wulfers, continued to work out of Atlanta's Monte Carlo office. From there, he supervised Atlanta's litigation, helping, among other things, to respond to discovery requests. Atlanta paid for this office space, as well as for telephones, and the part-time accounting services of Jan Van Langen, Atlanta's former controller. Although Atlanta was admittedly doing little if any business, Monaco was the focus of its activity.

■ "Where a corporation is engaged in far-flung and varied activities ... its principal place of business is the nerve center ... from which its officers direct, control and coordinate all activities without regard to locale, in the furtherance of the corporate objective." *Scot Typewriter Co. v. Underwood Corp.*, 170 F.Supp. 862, 865 (S.D.N.Y.1959) (Weinfeld, J.). Although, Atlanta was by no means a far-flung enterprise at the commencement of this suit, its only activity, litigation, was directed and coordinated by Wulfers from Atlanta's office in Monaco.[5] Although novel, these facts indicate that Monaco was Atlanta's principal place of business world-wide. There is simply not enough authority in these circumstances for deeming Atlanta a citizen of New York under section 1332(c).

---

**3.** "[T]he trend of recent decisions, and the opinion of the commentators, is to deem" the section applicable. *Arab International Bank & Trust Co. v. National Westminster Bank, Ltd.*, 463 F.Supp. 1145 (S.D.N.Y.1979). Were it necessary to reach this issue, we would follow this trend.

**4.** Citizenship, for purposes of diversity, is measured from the date that suit is commenced.

*Smith v. Sperling*, 354 U.S. 91, 77 S.Ct. 1112, 1 L.Ed.2d 1205 (1957).

**5.** When Atlanta filed its bankruptcy petition, the bankruptcy trustee assumed primary responsibility for directing and coordinating Atlanta's litigation. Wulfers continues, however, to assist in that task.

Even if Atlanta did no business in Monaco, we would hesitate to deem New York its world-wide principal place of business. Instead, we might hold, as some have suggested, that no principal place of business existed. *See* J. Friedenthal, *New Limitations on Federal Jurisdiction*, 11 Stan.L. Rev. 213, 225 (1959) *quoted in*, 13B C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 3264 n. 28 (2d Ed.1984) ("[I]t would be feasible and desirable for the courts to hold in appropriate cases that no principal place of business exists. What evidence we do have, however, would seem to command the courts to find a principal place of business in every situation.")

■ The defendant contends that testimony of Atlanta's representatives at a January 31, 1985 creditors meeting constitutes a judicial admission that, as of the commencement of this suit, New York was Atlanta's world-wide principal place of business. Alternatively, the defendant contends that the testimony judicially estops Atlanta from claiming that its principal place of business was elsewhere. Neither contention stands up to scrutiny.

The bankruptcy judge did not preside at the creditors meeting, which was held pursuant to 11 U.S.C. § 341(c) (1982). J.G. Wulfers; Cyndy Korman, Atlanta's bankruptcy counsel; and Michael Arra, Atlanta's special litigation counsel, testified as follows:

"THE PRESIDING OFFICER: ... Can you tell me on what basis [Atlanta's petition] was filed in the Southern District of New York?

MS. KORMAN: For the reason that the debtor's assets, the principal assets, have been in New York for the 90 days preceding the petition.

THE PRESIDING OFFICER: And what principal assets are those?

MS. KORMAN: Litigations, several outstanding litigations.

THE PRESIDING OFFICER: So you are saying the only principal assets that were in this district were litigation files?

MR. WULFERS: Those are the principal assets, outstanding accounts receivable, many of which exist in New York, are the assets of the corporation.

THE PRESIDING OFFICER: Does this debtor own any equipment?

MR. WULFERS: No, sir.

\* \* \* \* \* \*

THE PRESIDING OFFICER: What operations, if any, are going on at this point?

MR. WULFERS: No operations at all, sir, since the beginning of 1983.

THE PRESIDING OFFICER: No operations since the beginning of 1983?

MR. WULFERS: Right.

THE PRESIDING OFFICER: Then what was there that was being reorganized?

MR. WULFERS: Maybe you can help me.

MS. KORMAN: What's being organized is not so much an ongoing entity but the collection of the outstanding accounts receivable on the prosecution of the Waldron action and related actions, which are the principal assets of the corporation, which most effectively can be collected through a Chapter 11.

\* \* \* \* \* \*

THE PRESIDING OFFICER: Under Exhibit B [annexed to Atlanta's voluntary bankruptcy petition], it shows Mr. Wulfers' address as located in Monaco.

MR. WULFERS: Yes, sir.

THE PRESIDING OFFICER: Is there an address or location of the debtor in the United States?

MS. KORMAN: Yes, there is.

\* \* \* \* \* \*

MR. ARRA: ... [T]he landlord wanted Atlanta to move its records out by June 30th. Atlanta had maintained an office at 19 Rector Place.

I thereupon rented offices on their behalf at 15 Park Place down the street here so we could move those records out of storage because we needed them for

litigation as well as a place for Atlanta to have its office.

Then this bankruptcy occurred and I simply continued until January 31st, which we had got a few more days than I thought.

So essentially Atlanta, meeting with Mr. Wulfers' consent, has an office down here at 15 Park Place.

MR. WULFERS: Park Row.

MR. ARRA: And the landlord of that building is Urban Management, and all their corporate records that we have in the United States are in the offices right now.

THE PRESIDING OFFICER: Are there any other employees?

MR. ARRA: No, sir.

THE PRESIDING OFFICER: Who is 'we'?

MR. WULFERS: At the moment, it is me alone, but the management office of Atlanta Shipping Corporation [in Monte Carlo] was closed down approximately eight months ago or seven months ago, in June or July of 1984, and until that time, we had been occupying an office with three persons and a secretary during the accountancy, and after July, in order to mitigate further expense, I was the only person who remained.

\* \* \* \* \* \*

MR. WULFERS: At that time, that is November 26, 1984, there was only one director and that was me, because I was the only person left in Atlanta Shipping Corporation.

Toder Affidavit, Exhibit 5, Transcript at 6–11, 14, 15.

This testimony must be viewed in context. The presiding officer was apparently concerned that Atlanta, an alien corporation, might be ineligible to file a petition for reorganization under the bankruptcy code in this district. Only a corporation that resides or has a domicile, place of business, or property in the United States ... may be a debtor [and reorganize] under the bankruptcy code. 11 U.S.C. § 109(a) (1982).

"Once a court has found that a particular [entity], who may be an alien, is eligible to be a debtor under the Code, because that individual has a place of business or property in the United States, and therefore the bankruptcy courts can entertain the petition," [28 U.S.C. § 1408(1)] indicates the appropriate venue for that proceeding."

3 Collier on Bankruptcy ¶ 3.02(c)(iv) (15th ed. 1985). Under that section, venue lies in the district court for the district—in which the domicile, residence, principal place of business in the United States, or principal assets in the United States, of the person or entity that is the subject of such case have been located for the one hundred and eighty days immediately preceding such commencement, or for a longer portion of such one-hundred-and-eighty-day period than the domicile, residence, or principal place of business, in the United States, or principal assets in the United States, of such person were located in any other district....

28 U.S.C. § 1408(1) (1982). The above-referenced testimony addressed the presiding officer's apparent concern that Atlanta might not satisfy these requirements. In order to assuage his fears, Atlanta's representatives testified to the presence of substantial assets or property in New York. The testimony, *in toto*, emphasized the presence of Atlanta's litigation assets in New York, not the presence of any business assets or principals there. The testimony confirmed Atlanta's representation in its voluntary petition for bankruptcy that it had its principal assets within the United States during the preceding 180 days. Toder Affidavit, Exhibit 3 at 1. Atlanta had not there indicated, as it could have, that its residence or domicile was in the United States. *Id.*

At the creditors' meeting, Atlanta did not admit that New York was its principal place of business. Since its position at that meeting was not inconsistent with its position herein, the doctrine of judicial estoppel, which prevents a party who succeeds in maintaining a position from thereafter

asserting a contrary position in the same or related litigation, *Environmental Concern, Inc. v. Larchwood Construction Corp.*, 101 A.D.2d 591, 476 N.Y.S.2d 175, 177 (2d Dep't 1984), is inapplicable.[6]

Although the plaintiff's claims are non-maritime, the Court has subject matter jurisdiction by virtue of the parties' diverse citizenship. The defendant's motion to dismiss for lack of subject matter jurisdiction is denied.[7]

### III. *Discussion—Part II:* Motions on the Substantive Claims

#### A. The Fraudulent Conveyance Claims

The defendant moves against the various fraudulent conveyance claims on a variety of grounds. It first seeks to dismiss all of the claims for failure to state a claim on which relief can be granted. Alternatively, it moves, pursuant to Fed.R.Civ.P. 9(b), to dismiss these claims for failure to plead fraud with particularity. Finally, it seeks partial summary judgment on some claims for failure to comply with the statute of limitations.

**6.** The doctrine applies only when an assertion has prejudiced a party in a prior judicial proceeding. *Mann Theatres Corp. v. Mid-Island Shopping Plaza Co.,* 94 A.D.2d 466, 464 N.Y.S.2d 793, 800 (2d Dep't 1983), *aff'd,* 62 N.Y.2d 930, 468 N.E.2d 51, 479 N.Y.S.2d 213 (1984). Arguably, the creditors meeting, which the bankruptcy judge did not attend, was not a judicial proceeding. In addition, it is unclear how the plaintiff's assertions prejudiced the defendant, who did not even attend the creditors' meeting.

**7.** Consequently, the plaintiff can only state claims under New York law. Any claims that it purports to state under federal maritime law or any claims arising under Federal law are dismissed.

**8.** Section 273 reads in full,
Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration.
N.Y.Debt. & Cred.Law § 273 (McKinney Supp. 1986) ( [hereinafter "D.C.L. § ——"] )

**9.** Section 273-a reads in full,
Every conveyance made without fair consideration when the person making it is a

### 1. Motions to Dismiss for Failure to State a Claim on Which Relief Can be Granted

Atlanta has alleged that every payment from IMH to Chemical constituted a fraudulent conveyance in violation of New York's Debtor and Creditor Law. IMH allegedly violated each of the D.C.L.'s five substantive provisions. Chemical asserts that Atlanta can not state a claim for a fraudulent conveyance under any of these provisions.

##### a) The Presumed Intent Claims

Sections 273, 273–a, 274 & 275 of the D.C.L. prohibit conveyances made without fair consideration by a person or entity "who is or will be thereby rendered insolvent," D.C.L. § 273,[8] who is a "defendant in an action for money damages," *id.* § 273–a,[9] who is "engaged or about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital...." *id.* § 274,[10] or "who intends or believes that he will incur debts beyond his ability to pay as they mature." *Id.* § 275.[11] Under these sections,

defendant in an action for money damages or a judgment in such an action has been docketed against him, is fraudulent as to the plaintiff in that action without regard to the actual intent of the defendant if, after final judgment for the plaintiff, the defendant fails to satisfy the judgment.
D.C.L. § 273–a.

**10.** Section 274 reads in full,
Every conveyance made without fair consideration when the person making it is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonable small capital, is fraudulent as to creditors and as to other persons who become creditors during the continuance of such business or transaction without regard to his actual intent.
D.C.L. § 274.

**11.** Section 275 reads in full,
Every conveyance made and every obligation incurred without fair consideration when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors.

[f]air consideration is given for property, or obligation,

(a) When in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or

(b) When such property, or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property, or obligation obtained.

D.C.L. § 272. A fraudulent intent will not be presumed, unless fair consideration is lacking. Absent a presumed intent, a plaintiff can not state a claim under any of the above-noted sections of the D.C.L. Both parties concede that IMH's payments to Chemical fairly satisfied an antecedent debt, but Atlanta contends that the absence of good faith on Chemical's behalf gives rise to a presumption of fraudulent intent.

Generally, a transfer for antecedent debt is deemed a good faith transfer. Bad faith will only vitiate such a transfer when the transferee is an officer, director, or major stockholder of the transferor. *In re Checkmate Stereo and Electronics, Ltd.*, 9 B.R. 585, 617 (Bankr.E.D.N.Y.1981), *aff'd*, 21 B.R. 402 (E.D.N.Y.1982); *Southern Industries v. Jeremias*, 66 A.D.2d 178, 411 N.Y.S.2d 945 (2d Dept.1978). This is the only exception to the rule that a transfer for antecedent debt is a transfer for fair consideration within the meaning of the D.C.L. McLaughlin, *Application of the Uniform Fraudulent Conveyance Act*, 46 Harv.L.Rev. 404, 412–13 (1933) (Under the Uniform Fraudulent Conveyance Act, "satisfaction of an antecedent debt has been duly recognized as fair consideration. It necessarily follows that preferences are not bad unless invalidated by some law other than the Uniform Act. The preferred party may be the grantor's wife, or a close relative, or one with whom the grantor has intimate business relations. But preferences by corporations of their officers have

D.C.L. § 275.

long been held objectionable."). Due consideration of the transferee's fiduciary duty to other creditors of the transferor underlies this exception.

In this case, the transferee, Chemical, is neither an officer, director, nor major stockholder of the transferor. Nor have sufficient facts been alleged to support an inference that Chemical controls IMH or has otherwise assumed a duty to its creditors. *See infra* pp. 34–37. No court will presume a fraudulent intent in these circumstances.

At most, IMH preferred Chemical to Atlanta and its other creditors. Atlanta could have forced Chemical to treat it fairly by putting IMH into bankruptcy and attacking its transfers as preferential. Many years later, Atlanta seeks to exercise this foregone option. IMH's right to prefer one creditor over another is not assailable under the presumed intent provisions of the D.C.L.

The transfer is not rendered illegal by the fact that the transferor was insolvent or that the transferee has knowledge of such insolvency. Nor is the transfer subject to attack by reason of knowledge on the part of the transferee that the transferor is preferring him to other creditors, even by virtue of a secret agreement to that effect. Moreover, the fact that a confidential relation exists between the grantor and the grantee does not affect the validity of the transfer.

24 N.Y.Jur. *Fraudulent Conveyances* § 75 at 494–95 (1962) (footnotes omitted). Unless the transfer is made with actual intent to hinder, delay, or defraud creditors, it is subject to avoidance only to the extent prohibited by the Bankruptcy Code or statutes prohibiting preferences in general assignments for the benefit of creditors. *Id.* at 495. Consequently, the motions to dismiss Atlanta's claims under sections 273, 273–a, 274, and 275 of the D.C.L. are granted.[12]

**12.** The Court need not consider the defendant's motion for summary judgment on these claims.

### b) The Actual Intent Claims

■ The plaintiff also attempts to state a claim under D.C.L. § 276, which states, "Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors." The defendant contends that the complaint can not allege an actual intent to defraud Atlanta, but at most alleges an intent to prefer, which is insufficient.

In order to state a claim under section 276, a creditor need only establish an "actual intent to hinder and delay." An actual intent to defraud is unnecessary. *Flushing Savings Bank v. Parr*, 81 A.D.2d 655, 438 N.Y.S.2d 374, 376 (2d Dep't), *appeal dismissed*, 54 N.Y.2d 770, 426 N.E.2d 752, 443 N.Y.S.2d 61 (1981); *Farino v. Farino*, 113 Misc.2d 374, 449 N.Y.S.2d 379, 386 (Sup.Ct.Nassau Co.1982).

> The requisite intent under ... section [276] need not be proven by direct evidence but may be inferred (a) where the transferor has knowledge of the creditor's claim and knows that he is unable to pay it; (b) where the conveyance is made without fair consideration; or (c) where the transfer is made to a related party (i.e., husband to wife, corporation to stockholder).

*De West Realty Corp. v. Internal Revenue Service*, 418 F.Supp. 1274, 1279 (S.D.N.Y. 1976).

The plaintiff has alleged that IMH knew and indeed intended to deprive Atlanta of payment on its claim, and that Chemical was a knowing and willing transferee. *See, e.g.*, Amended Complaint ¶¶ 89, 97. It has pleaded more than a mere intent to prefer, it has alleged an improper intent to defraud, or, at a minimum, delay or hinder Atlanta.

The defendant nevertheless maintains that "a transfer by a debtor to pay or secure an antecedent debt will not be deemed a transfer to hinder, delay, or defraud creditors." Memorandum in Support at 24. The leading case cited for this proposition is *Irving Trust Co. v. Kaminsky*, 19 F.Supp. 816, 818 (S.D.N.Y.1937), wherein the court stated that "a transfer by an insolvent debtor to pay or to secure an antecedent debt has never been treated as a transfer to hinder delay or defraud creditors...." *Id.* at 818. The rigidity of *Kaminsky* and the other cases the defendant cites no longer characterizes the law of fraudulent conveyances. The mere existence of an antecedent debt is not alone sufficient to validate an otherwise fraudulent transfer. 24 N.Y.Jur., Fraudulent Conveyances § 76 (1962). Should Atlanta properly plead and prove its allegation that IMH intended to hinder, delay, or defraud Atlanta when it made the various transfers to Chemical, it may void those transfers under D.C.L. § 276.[13]

### 2. Motion to Dismiss for Failure to Plead Fraud with Particularity

The pleading requirements of Fed.R. Civ.P. 9(b) guard against the undue expansion of the fraudulent conveyance concept that transferees for antecedent debt, like the defendant, necessarily fear. The defendant moves to dismiss the fraudulent conveyance claims for failure to satisfy those requirements. That motion is granted.

■ Rule 9(b) provides that "[i]n all averments of fraud ... the circumstances constituting the fraud ... shall be stated with particularity." Fed.R.Civ.P. 9(b). Mere conclusory allegations that the defendants' conduct was fraudulent are not enough. *Decker v. Massey-Ferguson, Ltd.*, 681 F.2d 111, 114 (2d Cir.1982). Instead, the complaint must allege with some specificity the acts or statements constituting the fraud. *Ross v. A.H. Robbins Co.*, 607 F.2d 545, 557 (2d Cir.1979), *cert. denied*, 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980).

---

**13.** The scope of the appropriate relief, if any, has neither been briefed by the parties nor determined by the Court.

■ In recognition of these policies, courts generally dismiss allegations of fraud based on information and belief. *Segal v. Gordon,* 467 F.2d 602, 608 (2d Cir. 1972). However, a fraud pleading that concerns matters peculiarly within the adverse party's knowledge, will satisfy the 9(b) requirements if accompanied by a statement of facts upon which the belief is founded. *Id.* at 608; *Posner v. Coopers & Lybrand,* 92 F.R.D. 765, 769 n. 4 (S.D.N.Y.1981); *Gross v. Diversified Mortgage Investors,* 431 F.Supp. 1080, 1087 (S.D.N.Y.1977); 2A J. Moore & J. Lucas, *Moore's Federal Practice* ¶ 9.03, at 9–26 through 9–27 (1984).

■ The plaintiff has wholly disregarded these settled rules of pleading. It has pleaded the entire amended complaint "upon information and belief," without stating the facts upon which its belief is founded. The remaining fraudulent conveyance claims are dismissed with leave to replead within 30 days.[14] Since the plaintiff has had substantial discovery against IMH and its principals, and some additional discovery against Chemical, the Court can envision few if any allegations that would have to be pleaded on information and belief. If there are facts peculiarly within the defendant's knowledge, the plaintiff may plead them on information and belief and include a statement of facts upon which the belief is founded. Further scrutiny of the pleadings must await a new submission.

## B. The Aiding and Abetting Claim

■ The fourth cause of action contains a claim against Chemical for aiding and abetting a fraudulent conveyance. We do not believe it possible to state such a claim.

In a fraudulent conveyance action, the plaintiff attacks the conveyance seeking to reclaim the property conveyed. 24 N.Y. Jur., Fraudulent Conveyances § 86 (1962). The appropriate relief is to void the conveyance. An aiding and abetting claim against someone other than a transferee is meaningless in these circumstances. That aspect of the fourth cause of action alleging that Chemical aided and abetted a fraudulent conveyance is dismissed.

## C. The Preference Claims

The defendant moves to dismiss those portions of the amended complaint, particularly the second, seventh, and the part of the third cause of action that refer to "preference." The plaintiff's response to this motion is almost indecipherable.[15]

In its initial memorandum in opposition, Atlanta came right out and stated, "The complaint charges Chemical Bank with a fraudulent transfer not preference." Memorandum in Opposition at 75. In a sur-reply memorandum, the plaintiff apparently changed its tune, stating, "It is clear from the allegations of the complaint that Atlanta is relying upon several theories of preference as follows." Sur-reply Memorandum at 5. The plaintiff continued, "The good faith requirement of D.C.L. 272 makes payments to transferees with certain knowledge preferential even if paid for or in repayment of an antecedent indebtedness." *Id.* Thus, the plaintiff is admittedly not relying on a theory of preference but on several sections of the D.C.L. that it believes sound in preference.

The second and seventh causes of action, sounding only in preference, and that portion of the third cause of action that purports to state a claim for preference are

---

**14.** Wherever possible, the plaintiff should endeavor to simplify and clarify the remainder of its pleading. In particular, separate claims should be pleaded separately. However, no claim should be pleaded twice. The fraudulent conveyance claim should be clearly stated once, not five or six times. No new claims may be pleaded, nor may the plaintiff replead any claim that the Court has dismissed. Any new or previously dismissed claims will be dismissed *sua sponte.* The repleaded complaint should facili-

tate the defendants' answer, the Court's understanding, and the parties' discovery, and should comply with all other directives in this opinion.

**15.** It ill behooves the plaintiff to fashion arguments that defy comprehension. By forcing the Court to endlessly labor to understand its position, the plaintiff defeats its stated purpose of moving this litigation to a speedy conclusion.

dismissed. To the extent that those causes of action state claims under the D.C.L. or under the Business Corporation Law, the same claims are stated elsewhere in the amended complaint.

### D. The Business Corporation Law Claims

After the defendant moved to dismiss those aspects of the fourth claim arising under sections 510, 719(a)(1), and 720 of New York's Business Corporation Law, N.Y.Bus.Corp.Law §§ 510, 719(a)(1) & 720 (McKinney 1963) [hereinafter "B.C.L. § ——"], the plaintiff appeared to reverse course, stating that it had not attempted to state claims under those sections. Rather the B.C.L. purportedly set up a measure by which the conduct of the defendants was to be judged, *i.e.*, a *per se* standard. Memorandum in Opposition at 95. In its sur-reply, Atlanta backed away from its new position, arguing that it had timely stated claims under the relevant sections of the B.C.L. In the interest of completeness, we accept the plaintiff's last-stated position, as best we can construe it.

### 1. Section 719(a)(1)

■ B.C.L. § 719(a)(1)[16] creates a cause of action against members of the board of directors of a corporation who authorize a dividend in contravention of B.C.L. § 510 [17] which in turn prohibits a corporation from declaring or paying a dividend to shareholders if the corporation is insolvent or would thereby be rendered insolvent. Atlanta alleges that Chemical is liable for

aiding and abetting IMH's alleged violation of section 719.

Chemical correctly asserts that Atlanta is not the proper party to state a claim under section 719. By its own terms, that section applies only "to directors of a corporation who vote for or concur in" the prohibited transaction. *Id.* § 719(a). Accordingly, the various exculpatory provisions relating to § 719(a) also apply only to directors. *See, e.g.,* B.C.L. § 717 (limiting the liability of directors who perform their duties in good faith). Although section 58 of New York's Stock Corporation Law, section 719's predecessor provision, was construed to impose liability on transferees with knowledge, *Field v. Bankers Trust Co.,* 296 F.2d 109, 110 (2d Cir.1961) (Lumbard, C.J.), *cert. denied,* 369 U.S. 859, 82 S.Ct. 948, 8 L.Ed.2d 17 (1962), the courts have never gone so far as to impose aiding and abetting liability under either section.

Chemical is neither a director of IMH, nor a recipient (transferee) of a dividend or distribution. Rather, DIC and Underhill allegedly received the improper dividend that underlies the section 719 claim. Other transferees are referenced but not identified. Chemical can not be liable under section 719 merely as an aider and abettor.

### 2. Section 720

■ B.C.L. § 720 authorizes an action against officers and directors of a corporation "to set aside an illegal conveyance, assignment or transfer of corporate assets, where the transferee knew of its unlawfulness." *Id.* § 720(a)(2) (McKinney Supp. 1986).[18] Section 720 simply restates, with

---

**16.** Section 719(a)(1) provides,

(a) Directors of a corporation who vote for or concur in any of the following corporate actions shall be jointly and severally liable to the corporation for the benefit of its creditors or shareholders, to the extent of any injury suffered by such persons, respectively, as a result of such action:

(1) The declaration of any dividend or other distribution to the extent that it is contrary to the provisions of paragraphs (a) and (b) of section 510 (Dividends or other distributions in cash or property).

N.Y.Bus.Corp.Law § 719(a)(1) (McKinney 1963) (hereinafter "B.C.L. § ——").

**17.** That sections provides, in pertinent part,

(a) A corporation may declare and pay dividends or make other distributions in cash or its bonds or its property, including the shares or bonds of other corporations, on its outstanding shares, except when currently the corporation is insolvent or would thereby be made insolvent....

B.C.L. § 510(a).

**18.** Section 720 provides, in pertinent part,

(a) An action may be brought against one or more directors or officers of a corporation to procure a judgment for the following relief:

 * * * * * *

slight modification, General Corporation Law § 60. B.C.L. § 720: Legislative Studies and Reports (McKinney 1963). Although, by its terms, section 60 only authorized actions against directors and officers, a knowing transferee was liable thereunder to the corporation and its creditors. *Trionics Research Sales Corp. v. Nautec Corp.,* 28 A.D.2d 664, 280 N.Y.S.2d 630 (1st Dep't 1967), *rev'd on other grounds,* 21 N.Y.2d 574, 237 N.E.2d 68, 289 N.Y.S.2d 745 (1968); *Henry v. First National Bank,* 110 N.Y.S.2d 115, 123 (Sup.Ct.Westchester County 1951).

Read literally, the amended complaint alleges that Chemical violated section 720 by aiding and abetting IMH's directors in transferring corporate assets in breach of their fiduciary duties to IMH. We construe it liberally to allege a claim against Chemical as a transferee of those assets. Section 720 authorizes such a claim.

Assuming, for purposes of this motion, that the three year statute of limitations in section 214(2a) of New York's Civil Practice Law [hereinafter C.P.L.R. § "———"] [19] applies, the section 720 claim is not time-barred, as Chemical contends. The statute of limitations does not begin running against a creditor plaintiff under section 720 until the entry of judgment and return of execution unsatisfied. *Buttles v. Smith,* 281 N.Y. 226 at 236, 22 N.E.2d 350 (construing General Corporation Law § 60); *Storer v. Ripley,* 12 Misc. 2d 466, 171 N.Y.S.2d 14, 16–17 (Sup.Ct.Westchester Co. 1958) (same). The plaintiff obtained a judgment against Atlanta on October 8, 1982 and commenced this action on December 11, 1984, less than three years later. The motion to dismiss the plaintiff's claim under B.C.L. § 720 is denied. The claim under sections 510 and 719 is dismissed.

(2) To set aside an illegal conveyance, assignment or transfer of corporate assets, where the transferee knew of its unlawfulness.

\* \* \* \* \* \*

(b) An action may be brought for the relief provided in this section ... by a corporation, or a receiver, trustee in bankruptcy, officer, director or judgment creditor thereof....
B.C.L. § 720 (McKinney 1963 & Supp.1986).

## E. The Fifth, Sixth, and Eighth Causes of Action

The fifth, sixth, and eighth causes of action seek to hold Chemical liable for IMH's obligations to Atlanta by virtue of Chemical's alleged status as a fiduciary (fifth cause of action), a control person (sixth cause of action), or a joint venturer (eighth cause of action). Chemical moves to dismiss these claims for failure to state a claim on which relief can be granted [20] or, alternatively, seeks a more definite statement of these claims.

### 1. The Fiduciary Duty Claim

The plaintiff alleges that Chemical breached a fiduciary duty to IMH's other creditors. The duty allegedly arose by virtue of Chemical's status as a creditor with special inside knowledge of the management and financial affairs of IMH. Atlanta cites no authority for the existence of such a duty, nor has our research revealed any. Absent an allegation that Chemical assumed a status more substantial than that of a creditor, we refuse to impose upon it any special fiduciary duty. *Cf. Farm Stores, Inc. v. School Feeding Corp.,* 102 A.D.2d 249, 477 N.Y.S.2d 374, 378 (2d Dep't 1984), *aff'd,* 64 N.Y.2d 1065, 479 N.E.2d 222, 489 N.Y.S.2d 877 (1985) (Creditor who exercised his influence as a shareholder in decisions that directly affected his investments, consented to challenged fraudulent distributions had a fiduciary duty to the rights of general creditors). Atlanta already has ample recourse, of which it is taking full advantage, against IMH's other creditors.

### 2. The Control Person Claim

One who controls a corporation cannot recover on its loans to the corporation to the

**19.** C.P.L.R. § 214(2) reads, "an action to recover upon a liability, penalty or forfeiture created or imposed by statute must be commenced within three years." N.Y.Civ.Prac.Law § 214(2) (McKinney 1981).

**20.** Atlanta's response to this aspect of the motion is typically murky and of little assistance to the Court.

detriment of other creditors. *See Pepper v. Litton*, 308 U.S. ·295, 308–10, 60 S.Ct. 238, 246–47, 84 L.Ed. 281 (1939) (Loans of dominant or controlling stockholder subordinated to claims of other creditors). But Atlanta's conclusory allegations that Chemical controlled IMH will not suffice to state a claim under this theory.

In order to assume the mantle of control and its associated benefits and perils, one must manage and conduct the business of the corporation. *Levy v. American Beverage Co.*, 265 A.D. 208, 38 N.Y.S.2d 517 (1st Dep't 1942). Atlanta has not alleged facts sufficient to place Chemical in that role. Rather the amended complaint alleges that DIC, Underhill, the joint venture and their principals controlled the affairs of IMH. Their self-interested actions were allegedly primarily responsible for IMH's conduct. Although the amended complaint alleges that Chemical's bargaining position vis-a-vis IMH was strong, conduct amounting to management or control is not alleged. The sixth cause of action is, therefore, dismissed.

### 3. The Joint Venture Claim

Finally, Atlanta alleges that Chemical and IMH were joint venturers. A joint venture is

> an association of two or more persons, in the nature of a partnership, to carry out a single enterprise for profit, for which purpose the members combine their property, money, effects, skill, and knowledge, and agree that a community of interest shall exist among them as to the undertaking's purpose, and that each coventurer shall stand in the relation of principal as well as agent to, as to each of the other coventurers, with an equal right of control of the means used to carry out the purpose of the venture.

16 N.Y.Jur.2d § 1576 (1981). "A transaction involving a loan of money and creating a debtor-creditor relationship will not of itself make the lender and the borrower joint venturers." *Id.* at § 1577.

 IMH and Chemical are not alleged to have shared their skill, knowledge, property or effects. Chemical was a lender, not a coventurer. Chemical did not stand to share in the profits of IMH, and stood to share in the losses only to the extent that it was not repaid. The amended complaint does not contain any allegations that would support its conclusory assertion that Chemical and IMH were co-venturers.

The fifth, sixth and eighth causes of action are dismissed for failure to state a claim on which relief can be granted. The defendant's motion for a more definite statement of these claims is, thereby, rendered moot.

### F. The Article 9 Claim

In its eleventh cause of action, Atlanta purported to state a claim under Article 9 of the Uniform Commercial Code against Chemical for receiving the proceeds of the sale of 141 homes in which Atlanta held a superior security interest.[21] Chemical moved for partial summary judgment on this claim because actions for conversion of secured property are governed by a three year statute of limitations. C.P.L.R. § 214(4). In typical fashion, Atlanta responded by denying that it intended to state a claim under Article 9. Chemical has accepted Atlanta's withdrawal of its claim. Even if Atlanta had not withdrawn this claim, we would grant summary judgment for failure to bring this claim within the applicable three-year limitations period.

---

**21.** The pertinent portions of the amended complaint state,

> 137. In the event IMH's request for a permanent injunction in 82 Civ. 3081 is denied, Chemical Bank will be guilty of receiving the proceeds of the sale of approximately 141 modular homes which had been assigned to Atlanta pursuant to the Credit Agreement.
> \* \* \* \* \* \*
> 140. As a result of the foregoing, Chemical Bank is liable to Atlanta under the Admiralty Laws of the United States; the Uniform Commercial Code of New York, specifically but not limited to Article 9 thereof; and Article 10 Sections 273, 273–a, 274, 275 and 276 of the New York Debtor and Creditor Law.

Amended Complaint ¶¶ 137, 140.

### G. The Claims for Punitive Damages and Attorney's Fees

■ The defendant next moves to strike the plaintiff's demand in the twelfth cause of action for punitive damages and attorney's fees. The motion to strike the demand for punitive damages is granted. Punitive damages are not recoverable in an action to recover a fraudulent conveyance, the sole basis upon which the plaintiff rests its demand for such damages. *James v. Powell,* 19 N.Y.2d 249, 225 N.E.2d 741, 279 N.Y.S.2d 10 (1967).

The motion to strike the demand for attorney's fees is denied. Under D.C.L. § 276–a, a plaintiff who can establish that a fraudulent conveyance was "made by the debtor and received by the transferee with actual intent, as distinguished from intent presumed in law, to hinder, delay or defraud ... creditors" can recover attorney's fees. Since an issue of fact remains as to Chemical's actual intent, *see supra* pp. 26–27, we can not now dismiss the plaintiff's claim for attorney's fees.

### III. *Discussion—Part III:* Procedural Motions

### A. Security for Costs

■ The defendant asks the Court to require the plaintiff to post a bond as security for costs pursuant to CPLR § 8501.[22] That section mandates the provision of security when none of the plaintiffs is a "domestic corporation, a foreign corporation licensed to do business in the state or a resident of the state when the motion is made." CPLR § 8501(a). An award of security in an action by a debtor in possession is optional. *Id.* at § 8501(b). The plaintiff contends that Rule 39 of the Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York[23] governs the posting of security for costs in this action. Under Local Rule 39, "the Court, on motion or on its own initiative, may order any party to file an original bond for costs or additional security for costs in such an amount and so conditioned as it may designate." *Id.* We need not decide which provision to apply in this diversity action.[24] In our view, application of either the state or local rule compels the plaintiff to post a $10,000 bond as security for costs.

The federal courts look to the state statute for guidance in determining whether to require a plaintiff to post security for costs. *Rapol v. Henry R. Jahn & Sons,* 84 F.R.D. 42, 45 (S.D.N.Y.1979). Under either statute, the bond assures that a defendant who is sued will, if successful, at least be able to recoup its costs. J. McLaughlin, *Practice Commentaries* CPLR § 8501, C8501:1 (McKinney 1981). In deciding whether to require security, courts also consider whether a lawsuit is instituted solely to harass. *Rapol, supra,* 84 F.R.D. at 45; *see also River Plate Reinsurance*

---

**22.** CPLR § 8501 provides, in pertinent part.

(a) ... [u]pon motion by the defendant without notice, the court or a judge thereof shall order security for costs to be given by the plaintiffs where none of them is a domestic corporation, a foreign corporation licensed to do business in the state or a resident of the state when the motion is made.

(b) In court's discretion. Upon motion by the defendant with notice, or upon its own initiative, the court may order the plaintiff to give security for costs in an action by or against an assignee or trustee for the benefit of creditors, a trustee, a receiver or debtor in possession in bankruptcy.

C.P.L.R. § 8501 (McKinney 1981).

**23.** That rule states,

The court, on motion or in its own initiative, may order any party to file an original bond for costs or additional security for costs in such an amount and so conditioned as it may designate. For failure to comply with the order the court may make such orders in regard to noncompliance as are just, and among others the following: an order striking out pleadings or staying further proceedings until the bond is filed or dismissing the action or rendering a judgment by default against the non-complying party.

**24.** There is substantial disagreement in this district as to whether Local Rule 39 or C.P.L.R. § 8501 applies in diversity actions. *Compare Ilro Productions, Ltd. v. Music Fair Enterprises, Inc.,* 94 F.R.D. 76 (S.D.N.Y.1982) (Lowe, J.) (applying state rule) *with Rapol v. Henry R. Jahn & Sons, Inc.,* 84 F.R.D. 42 (S.D.N.Y.1979) (Cooper, J.) (applying federal rule but looking to state statute for guidance).

⌐⌐ *v. Jay-Mar Group, Ltd.*, 588 F.Supp. ⌐.D.N.Y.1984).

⌐⌐ this case, we perceive a high risk that ⌐he plaintiff, a debtor in bankruptcy, will be unable to pay the defendant's costs should the defendant prevail. The plaintiff itself admits that it "has no liquid assets except claims before this Court and claims in other districts...." Plaintiff's Memorandum in Opposition at 99. Although we do not believe the plaintiff brought this action only to harass the defendant, Atlanta's lack of assets and status as a debtor in bankruptcy counsels us to require it to post a bond as security for costs.[25]

The requirement should not, however, impede Atlanta's ability to prosecute this action. We, therefore, require the plaintiff to post a $10,000 bond. Although Atlanta's resources are not unlimited, it has testified that one of its creditors has agreed to finance up to $300,000 in fees for this and related litigations. Toder Affidavit, Exhibit 4, at 36. Requiring it to post a $5,000 bond should not seriously impede the prosecution of this action.

### B. Certification for Appeal

The plaintiff asks this Court to certify for interlocutory appeal the question of whether this Court has admiralty jurisdiction. It argues that our decision on that issue "involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b) (1982).[26] We do not agree with any of the plaintiff's

contentions. First, there is not substantial ground for difference of opinion on this question. Second, the question is not controlling, since the Court has held that it has another basis of subject matter jurisdiction. Finally, an immediate appeal will not advance this litigation. Indeed, the time spent on appeal will hinder its progress. Moreover, a finding that this Court has admiralty jurisdiction will necessitate reconsideration of nearly all of the motions now before us. This litigation must proceed apace. The plaintiff's request, pursuant to 28 U.S.C. § 1292(b), for an order permitting immediate appeal on the question of admiralty jurisdiction is denied.

### IV. *Conclusion*

1. The defendant's motion to dismiss this action for lack of subject matter jurisdiction is denied. Any claims that the plaintiff purports to state under federal maritime law or some other form of federal law are dismissed.

2. The defendant's motion to dismiss the second, third,[27] and seventh causes of action is granted.

3. The defendant's motion to dismiss the fifth, sixth, and eighth causes of action is granted.

4. That portion of the eleventh cause of action arising under the Uniform Commercial Code is dismissed.

5. The defendant's motion to dismiss those parts of the fourth cause of action purporting to state claims under sections 510 and 719 of the Business Corporation Law and for aiding and abetting violations

**25.** The plaintiff asks us to make a preliminary determination on the merits in order to decide whether to require costs. At this stage, that determination is neither possible nor necessary.

**26.** Section 1292(b) states,

When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order.

The Court of Appeals may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order. *Provided, however,* That application for an appeal hereunder shall not stay proceedings in the district court unless the district judge or the Court of Appeals or a judge thereof shall so order.

28 U.S.C. § 1292(b) (1982).

**27.** Any claims in the third cause of action that arise under the D.C.L. are stated elsewhere in the amended complaint.

of the Debtor and Creditor Law is granted. The motion to dismiss that aspect of the fourth cause of action purporting to state a claim under section 720 of the Business Corporation Law is denied.

6. The motion to strike the demand for punitive damages in the twelfth cause of action is granted.

7. The motion to strike the demand for attorney's fees is denied.

8. The motions to dismiss the claims arising under sections 273, 273–a, 274, and 275 of New York's Debtor and Creditor Law is granted. The motion, pursuant to Fed.R.Civ.P. 12(b)(6), to dismiss the claims arising under section 276 of that law is denied. The defendant's motion to dismiss that claim for failure to plead fraud with particularity is granted with leave to re-plead, in accordance with the instructions herein, *see supra* note 14, within 30 days.

9. The motion to dismiss the thirteenth cause of action, which seeks equitable relief for the fraudulent conveyance claims, is granted with leave to replead when the fraudulent conveyance claims are themselves repleaded.

10. The plaintiff is hereby ordered to post a $10,000 bond as security for costs. The plaintiff may not file its second amended complaint until the bond is posted.

11. The plaintiff's request for certification of this action for immediate appeal is denied.

SO ORDERED.