**SECON SERVICE SYSTEM, INC.,**
a/k/a Yale Transport Corporation, Plaintiff–Appellant,

v.

**ST. JOSEPH BANK AND TRUST COMPANY and Jay Chodock,**
Defendants–Appellees.

No. 87–2561.

United States Court of Appeals, Seventh Circuit.

Argued May 16, 1988.

Decided Aug. 18, 1988.

Arthur M. Wisehart, Wisehart & Koch, New York City, for plaintiff-appellant.

Calvin H. Cobb, Jr., Steptoe & Johnson, Washington, D.C., for defendants-appellees.

Before CUMMINGS, COFFEY and EASTERBROOK, Circuit Judges.

EASTERBROOK, Circuit Judge.

St. Joseph Bank & Trust Co. (the Bank) advanced $2.15 million in 1976 to enable St. Abbs, Inc., a holding company, to buy out Indiana Refrigerator Lines, Inc., a trucking company incorporated in Indiana. By 1978 Indiana Refrigerator Lines was in difficulty, with substantial debt outstanding to the Bank, and late in 1979 St. Abbs and the Bank began searching for a buyer. They found F. Ralph Nogg, an expert in trucking industry bailouts, who submitted a letter of intent to purchase St. Abbs and Indiana

Refrigerator Lines (collectively IRL) on October 23, 1979.

Before closing, Nogg hired Dermott Noonan, a former Yale University accounting professor, to examine IRL. Noonan's eventual conclusion, reached in May 1980, was that IRL's finances were "in a chäotic condition" and that it had incurred "substantial overdrafts" on its accounts at the Bank. The extent to which Noonan apprised Nogg of these facts before Nogg completed his purchase of IRL on December 17, 1979, is not clear, but Nogg himself testified that he knew IRL was in serious trouble when he decided to purchase it.

The purchase took the form of an agreement between Nogg and the Bank that enabled Nogg to vote 77% of St. Abbs's stock: 52% owned by Nogg, and 25% owned by the Bank but subject to Nogg's control as trustee under an irrevocable 5–year voting trust. In return for the St. Abbs stock, the Bank agreed to invest $300,000 in IRL, and Nogg agreed to cause IRL to use the cash to repay its overdrafts at the Bank. The Bank also promised to indemnify Nogg to the extent any material discrepancies in IRL's financial statements turned out to exceed $169,000.

The minutes of the initial December 17, 1979, shareholders' meeting show that Nogg, inexplicably described as the sole shareholder, voted to elect a seven-member Board of Directors for both St. Abbs and Indiana Refrigerator Lines. Two of its members (Richard A. Rosenthal and Samuel Raitzin) also served on the Bank's Board of Directors. Nogg installed himself as Chairman and Chief Executive Officer of both St. Abbs and Indiana Refrigerator Lines.

Early in 1980 Nogg began negotiating on IRL's behalf with Yale Express, Inc., and its wholly-owned subsidiary Secon Service System, Inc., New York corporations operating as debtors-in-possession under Chapter XI,[1] to purchase certain ICC operating

---

1. This isn't Yale's first acquaintance with the bankruptcy laws. Its previous reorganization, approved in 1972, led to several important decisions interpreting various provisions of the old bankruptcy statute. See *In re Yale Express System, Inc.*, 362 F.2d 111 (2d Cir.1966); *In re Yale Express System, Inc.*, 370 F.2d 433 (2d Cir.1966); *In re Yale Express System, Inc.*, 384 F.2d 990 (2d Cir.1967). Nor is this Mr. Nogg's first contact with Yale; he served with distinction as its

authorities from Secon. These negotiations had an incestuous air: In addition to his previous contacts with Yale, of which he was once trustee in bankruptcy, Nogg was Secon's fourth-largest creditor; Secon's counsel during the negotiations was Arthur M. Wisehart, a member of the Boards of Directors of St. Abbs and Indiana Refrigerator Lines until he resigned in January 1980. On May 30, 1980, the Bankruptcy Court for the Southern District of New York approved the purchase, and Indiana Refrigerator Lines and Secon signed a purchase agreement on June 27, 1980.

The purchase agreement entitled Secon to 2% of the gross revenues of Indiana Refrigerator Lines for six years, with a minimum yearly payment of $80,000 guaranteed after the first year. In the event of insolvency of Indiana Refrigerator Lines, the operating authorities were to revert automatically to Secon, which protected its position by taking out a security interest in the authorities themselves. Indiana Refrigerator Lines assumed the "primary responsibility" for obtaining the ICC's approval of the transfer (a condition of the agreement), and promised to bear most of the costs of dealing with the ICC. A standard integration clause supported the Agreement's provision that: "No promises, representations, warranties, guarantees or agreements not herein contained shall have any force or effect".

By September 1980 Nogg had lost interest in the operating authorities and stopped trying to obtain the ICC's approval for the transfer. Still short of cash, and responding to the Bank's increasing reluctance to honor IRL's rubber checks (the Bank had been tolerating overdrafts even after the repayments made when Nogg purchased IRL), Nogg worked out a deal with the Bank that would have provided IRL with a $1.5 million capital contribution in return for transfer to the Bank of 60% of the common stock of St. Abbs. The September 22, 1980, Memorandum of Understanding

memorializing this arrangement explained that an audit completed in June 1980 by Price Waterhouse at Nogg's behest revealed that IRL's financial situation was much worse than Nogg had thought, necessitating an infusion of money.

Immediately after signing the September 22 Memorandum, which would have given the Bank control of more than half of St. Abbs's common stock, Nogg decided that the recapitalization contemplated by the Memorandum wasn't worth the loss of his authority. He invoked the voting trust and forced St. Abbs's Board to repudiate the Memorandum. The Bank then agreed to an additional $500,000 loan and redemption of all of its St. Abbs shares in return for additional promissory notes and assurances of certain changes in IRL's financial practices. Raitzin and Rosenthal then resigned from the Boards of St. Abbs and Indiana Refrigerator Lines.

Despite the changes in IRL's financial practices, the Bank understandably continued to feel insecure, and on January 16, 1981, it filed a state court action in Nebraska (where Nogg had moved IRL's headquarters) to enforce its security interests in Indiana Refrigerator Lines' accounts receivable and other assets. St. Abbs and Indiana Refrigerator Lines responded by filing Chapter XI reorganization petitions.

Over the objections of Secon's counsel, the ubiquitous Mr. Wisehart, the bankruptcy court approved a plan that terminated all claims of IRL's creditors "whether ... based on allegations of equitable subordination, fraudulent conveyance, preferential treatment or nonvalidity of claims". Secon did not appeal the order approving the plan. Instead it filed a complaint in the Northern District of Indiana containing six claims against the Bank and four individual defendants. Subject matter jurisdiction was predicated on diversity of citizenship and on alleged violations of federal securities laws and the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.

---

trustee from December 1965 until October 1973. See *In re Yale Express System, Inc.*, 366 F.Supp. 1376, 1384–85 (S.D.N.Y.1973). While Yale's current reorganization has yet to demonstrate equivalent social value as a precedent-creator, perhaps it's on its way, even if Mr. Nogg can't repeat his performance as its trustee.

C. §§ 1961–68. Three of the individual defendants were dismissed without prejudice almost immediately. After three years of discovery, the Bank and the remaining individual defendant, Jay Chodock, filed a motion to dismiss under Fed.R.Civ.P. 12(b)(6), which the district court treated as a motion for summary judgment because it referred to matters outside the pleadings. The district court granted the motion.

Secon asserted six claims against the Bank. In Secon's view, the Bank (1) acted as a joint venturer with IRL and therefore is liable for the latter's failure to complete the purchase of the operating authorities; (2) conspired together with IRL and others to defraud Secon (by knowingly misrepresenting or concealing IRL's financial condition in order to induce Secon to accept delayed payments for its operating authorities); (3) did defraud Secon (by not making the delayed payments); (4) promoted fraudulent conveyances of funds from IRL to itself, and breached fiduciary duties to both IRL and Secon; (5) engaged in securities fraud; and (6) committed RICO violations.

Before we get under way, a little housekeeping. Mr. Chodock seems to have lingered in this case almost accidentally. Originally accused of being Raitzin's son-in-law and "interfer[ing] with the day-to-day operations of St. Abbs and IRL despite the fact that he was wholly inexperienced and incompetent in transportation matters", Mr. Chodock escaped Secon's attention in this appeal.[2] We presume Secon has abandoned any claim against him and we affirm the judgment in his favor without further ado.

## I

Secon's first attempt to recover damages for breach of the purchase agreement came in the bankruptcy proceeding. There, the creditors' committee (chaired by Wisehart, as Secon's representative) proposed to resolve all disputes between IRL and the

Bank in return for subordination of $850,-000 of the Bank's secured claims against Indiana Refrigerator Lines. The proposal—dubbed a "Compromise Agreement" although not everyone agreed—provided:

[N]either the Debtors ... nor any creditor of the Debtors shall have the right to assert any claim, demand, cause of action or claim of subordination against the Bank in connection with ... any transactions between or involving the Bank and the Debtors ...

The bankruptcy court's order approving the Compromise Agreement after a hearing under its cram-down power, 11 U.S.C. §§ 1124–29, echoed this provision:

[N]either the Debtors ... nor any creditor of the Debtors shall have the right to assert any claim, demand, cause of action or claim of subordination against the Bank ...

Secon did not appeal. Nonetheless it now contends that the Bank used its influence (or "control") over IRL and Nogg to induce IRL to transfer cash to the Bank when IRL was insolvent, with intent to defraud IRL's other creditors, such as Secon.

■ The district court in this action concluded that Secon's fraudulent conveyance claim is an attempt to relitigate an issue that was decided in the bankruptcy court proceeding. We agree. The bankruptcy court's final judgment on the merits bars relitigation of the same claim between the same parties. *Shaver v. F.W. Woolworth Co.*, 840 F.2d 1361, 1364 (7th Cir.1988); *Miller v. Meinhard–Commercial Corp.*, 462 F.2d 358 (5th Cir.1972) (existence of a confirmed reorganization plan bars subsequent action by a creditor alleging fraud in the negotiation of the plan).

Secon insists it was not a creditor of Indiana Refrigerator Lines and therefore not a party to the bankruptcy proceeding. But it was a member of the creditors' committee in that proceeding, and it never requested any change in that status under 11

---

**2.** Our examination of the record suggests that Secon's grievances against Chodock stem from Nogg's dispute with him about his request that IRL lease and furnish an apartment for him, and from friction between him and Nogg's vice

president in charge of operations, who resigned to protest his behavior. But because Secon has made nothing of this on appeal, we ignore it too.

U.S.C.App. § 1102(c) (1978),[3] as it should have done if it were not a bona fide creditor. It appeared by its counsel, Mr. Wisehart. It styled itself a creditor of Indiana Refrigerator Lines in its objection to the Compromise Agreement. Its objection recognized that the Compromise Agreement was an exercise of the bankruptcy court's cram-down powers. Maybe Secon believes in retrospect it should not have been a party, but it certainly was one.

Next, Secon argues that because the Bank and IRL were joint fraudfeasors, it could choose whom to sue; and in fact it could not have litigated its fraudulent conveyance claim successfully against IRL in the bankruptcy proceeding because IRL had no money it could have recovered. This ignores the undisputed fact that IRL must have had sufficient assets to warrant the Bank's attempt to enforce its security interests. The bankruptcy court's order left $700,000 of the Bank's secured claim unsubordinated, an amount far exceeding the $400,000 guaranteed payment Secon could have obtained based on its purchase agreement (which guaranteed Secon a minimum of $80,000 per year for five years). Evidently the bankruptcy court thought IRL still had more than $400,000 in assets. Finally, Secon contends that the Bank controlled IRL—an issue to which we return—and by misusing that control breached its fiduciary duties to IRL's creditors. Even if these premises are accepted,[4] the fact remains that both the Bank and Secon were parties to the bankruptcy proceeding. Secon, along with IRL's other creditors, benefited from the bankruptcy proceeding: the Bank subordinated $850,000 of its secured claims against Indiana Refrigerator Lines, thereby compensating all of IRL's other creditors pro-rata. This allowed the bankruptcy court to wipe out other direct claims against Indiana Refrigerator Lines under its cramdown powers. Secon's breach of fiduciary duty claim arises from the same "core of operative facts" as its fraudulent conveyance claim: the Bank's alleged use of its influence over IRL to induce preferential transfers of cash. Certainly Secon's claims of fraud and breach of fiduciary duty could have been asserted as defenses to the Bank's secured claims in the bankruptcy proceeding. Allowing Secon to raise those claims in positive form in a subsequent proceeding "would nullify rights established by the prior proceeding", and the prior judgment therefore precludes the effort. *Rudell v. Comprehensive Accounting Corp.*, 802 F.2d 926, 928 (7th Cir.1986). "Once a transaction has caused injury, all claims arising from that transaction must be brought in one suit or be lost." *Smith v. City of Chicago*, 820 F.2d 916, 918 (7th Cir.1987). Having chosen not to press its fraudulent conveyance claim in the proper forum, Secon cannot return to it here.

## II

In exchange for its operating authorities, Secon was to receive payments partially dependent on IRL's gross revenues for six years. Secon reasons that this makes the operating authorities "securities" subject to the Securities Exchange Act of 1934. Secon claims the Bank committed fraud in connection with their sale, by misrepresenting or concealing IRL's financial condition, a fact material to Secon's decision to sell the authorities. The district court concluded that the operating authorities are not "securities", and both the wording of the Act itself and authoritative interpretations of it vindicate that decision.

"The term 'security' means any note, stock, treasury stock, bond, debenture, cer-

---

3. Congress repealed this provision in 1986, long after the IRL bankruptcy passed the stage at which Secon should have invoked it.

4. If the Bank's position were analogous to that of a controlling shareholder, which we doubt, any fiduciary duties arising from that position would run to IRL and its other shareholders, see *Bailey v. Meister Brau, Inc.*, 535 F.2d 982, 993 (7th Cir.1976), leaving Secon without standing to challenge any breach. At most, the trustee in bankruptcy might have been able to recover damages for a breach, *Pepper v. Litton*, 308 U.S. 295, 307, 60 S.Ct. 238, 245, 84 L.Ed. 281 (1939), but he chose not to do so. Secon cannot now step into his shoes. See *Koch Refining Co. v. Farmers Union Central Exchange, Inc.*, 831 F.2d 1339 (7th Cir.1987); *In re Xonics Photochemical, Inc.*, 841 F.2d 198, 202 (7th Cir.1988).

tificate of interest or participation in any profit-sharing agreement, ... investment contract, ... or in general, any instrument commonly known as a security ..." 15 U.S.C. § 78c(a)(10).[5] All of the items enumerated are liabilities; the operating authorities were *assets* of Secon. This alone strongly suggests the operating authorities cannot be securities. Indeed, in *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 688–92, 105 S.Ct. 2297, 2302–05, 85 L.Ed.2d 692 (1985), the Supreme Court held that there is no need to examine the economic substance of a transaction to determine whether a particular instrument is a security, when its label and other characteristics all point in one direction. The operating authorities certainly aren't labeled securities, nor do they have the primary characteristic of securities: they aren't liabilities of Secon. In this matter the law follows the form, rather than the substance; Secon would have us reverse that rule.

Even the economic substance of the transaction fails to support Secon's contention that the operating authorities are securities. The Act's definition of "security" "seeks to confine the protection of the securities laws to investors and exclude from the Act's protection borrowers and lenders in commercial settings." *Hunssinger v. Rockford Business Credits, Inc.*, 745 F.2d 484, 488 (7th Cir.1984). Thus, the salient characteristic of an "investment contract"-type security is that it establishes a "transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party". *SEC v. Howey Co.*, 328 U.S. 293, 299, 66 S.Ct. 1100, 1103, 90 L.Ed. 1244 (1946). The same requirements apply to "certificate of participation"-type securities. *Hirk v. Agri–Research Council, Inc.*, 561 F.2d 96, 102 (7th Cir.1977). IRL did not expect profits solely from the efforts of Secon, nor did Secon solicit funds from other investors to whom it sold operating authorities or interests therein and pool them with funds from IRL, another prerequisite of an "invest-

ment contract". *Milnarik v. M–S Commodities*, 457 F.2d 274, 276–78 (7th Cir. 1972). The operating authorities are not securities; their purchase was an ordinary extension of credit by Secon to IRL, a transaction outside the reach of the Act.

Secon's casual allusion in its reply brief to the profitsharing feature of the purchase agreement as a way for others to profit from IRL's efforts suggests that it might have been trying to suggest that the purchase agreement itself was a "security". This mirror image of Secon's original argument would have been more plausible: Secon "invested" its valuable operating authorities in the purchase agreement, expecting to reap a return from IRL's efforts. But in *Marine Bank v. Weaver*, 455 U.S. 551, 102 S.Ct. 1220, 71 L.Ed.2d 409 (1982), the Court refused to characterize a functionally identical undertaking as a "security". There the plaintiffs had pledged an FDIC–insured certificate of deposit as security for a loan to a business. In consideration for the guarantee, the owners of the business (a wholesale slaughterhouse) agreed to pay to the plaintiffs 50% of their net profits for the duration of the guarantee, and to allow the plaintiffs use of their barn and pasture. When the business failed, the lender made known its intention to claim the certificate of deposit, and the plaintiffs commenced a securities fraud action against the lender, arguing that the agreement was a "security". The Court disagreed, reasoning that "unusual instruments found to constitute securities in prior cases involved offers to a number of potential investors.... [A] security is an instrument in which there is 'common trading.' ... Although the agreement gave the [plaintiffs] a share of the [business owners'] profits, if any, that provision alone is not sufficient to make that agreement a security." *Id.* at 559–60, 102 S.Ct. at 1225. Here, as in *Marine Bank*, the one-of-a-kind agreement between Secon and IRL has only one of the characteristics needed for a "certificate of participation"-

---

**5.** The definition of "security" in the Securities Act of 1933, set forth in 15 U.S.C. § 77b(1), is "virtually identical". *Tcherepnin v. Knight*, 389 U.S. 332, 335–36, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967). In practice, they are interchangeable.

type security, and lacks the essential common pool feature. Secon's reasoning would turn every contract to purchase something into a security, at least in the period before payment. We do not accept this reading of the Act. So even if Secon had not waived this line of argument by failing to assert it in the district court or in its opening brief here, it could not prevail by trying to apply the Securities Exchange Act to its purchase agreement.

### III

Having disposed of the make-weight arguments, we come to Secon's real complaint: that the Bank tricked it into agreeing to sell its operating authorities to IRL on what amounted to a time payment plan by creating the impression that the Bank would continue to provide infusions of capital, should they be necessary to IRL's future profitability. Left with no way to investigate IRL's true financial situation, Secon reasonably relied on the Bank's continued support and suffered losses when IRL broke its contract, losses for which the Bank is responsible.

Because Secon cannot point to any statements the Bank made directly to it, this is in effect a request that the district court pierce IRL's corporate veil in Secon's favor, and not just to reach IRL's shareholders but to go all the way to its primary creditor, the Bank. But a corporation is not the same as its shareholders, *In re Deist Forest Products, Inc.*, 850 F.2d 340, 341 (7th Cir.1988); or its affiliates, *In re Xonics Photochemical, Inc.*, 841 F.2d 198, 201 (7th Cir.1988); and certainly it is not identical to its creditors. The district court properly rejected this theory.

The purchase agreement between Secon and IRL called for interpretation according to the laws of New York, so Secon first complains that the district court erred in applying Indiana law. Secon misunderstands the issue the district court faced. No one disputes that IRL welched on the purchase agreement, the question to which the choice-of-law clause applied. But Secon is suing the Bank, not IRL, and not simply for breach of contract. The question here

is the *who*, not the fact, of liability. To reach the Bank, Secon needs the aid of principles having no contractual basis, and it depends on alleged oral agreements by the Bank to support IRL financially—agreements entered into before the purchase agreement was signed, and not referring to New York law. So the terms of the purchase agreement cannot control the choice of the law to be used in deciding whether to disregard them. A choice of law is necessary, *Van Dorn Co. v. Future Chemical and Oil Corp.*, 753 F.2d 565, 570–71 (7th Cir.1985), but to assess the correctness of the district court's choice we must turn to ordinary choice of law rules rather than to the provisions of the purchase agreement.

Although Secon has pressed claims founded on federal law in this case, its breach of contact and fraud claims reached the district court primarily under its diversity of citizenship jurisdiction. In such cases the district court must apply the choice of law rules of the jurisdiction in which it sits, in this case Indiana. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941).

We have not found, and the parties have not cited to us, any Indiana decisions discussing choice of law when the plaintiff seeks to disregard the corporate entity to hold investors liable for their corporation's contractual obligations. We know, however, that Indiana courts would use Indiana choice of law rules rather than New York choice of law rules even if the substantive question involved the purchase agreement rather than other, oral agreements between the Bank and IRL and equitable principles allowing disregard of IRL's corporate status. *Indiana & Michigan Electric Co. v. Terre Haute Industries, Inc.*, 507 N.E.2d 588, 597 (1st Dist.1987). The Indiana choice of law rule in contract cases is the "most intimate [i.e. significant] contacts" approach, under which the court considers the factors listed in the **Restatement (Second) of Conflict of Laws** § 188 (1971): the places of contracting, negotiating, and performance; the location of the contract's

subject matter; and the locations of the parties. *Eby v. York Division, Borg-Warner*, 455 N.E.2d 623, 626 (4th Dist.1983); see also *Hubbard Mfg. Co. v. Greeson*, 515 N.E.2d 1071, 1073 (Ind.1987). Here every factor except Secon's place of incorporation points to Indiana, and as we have said Secon was not even involved in the contracts we are called on to interpret here (the alleged oral agreements between IRL and the Bank), so we agree with the district court that Indiana substantive law applies. See also Philip I. Blumberg, **The Law of Corporate Groups: Tort, Contract, and other Common Law Problems in the Substantive Law of Parent and Subsidiary Corporations** § 26.02 (1987) (in the vast majority of situations, the law of the state of incorporation governs attempts to disregard the corporate entity). Where no state decisions are directly on point, the court of appeals can proceed from general principles if those principles are nearly universal, as here. *Havoco of America, Ltd. v. Hilco, Inc.*, 799 F.2d 349, 352–53 (7th Cir.1986).

Indiana recognizes the possibility of holding an investor liable on the theories Secon advances: joint venture, agency, and alter ego or instrumentality.[6] But Secon has not produced any evidence whatsoever on one or more of the essential elements of each of these theories of liability.

### A

■ All of these theories are variations on an argument that the district court should have disregarded IRL's corporate status to reach the Bank as IRL's primary creditor. In the language of Indiana decisions, Secon argues that it produced sufficient evidence to create a genuine issue of material fact about whether IRL was the Bank's "alter ego", which would have required disregard of IRL's corporate status, so that the district court erred in granting the Bank's motion for summary judgment. Bearing in mind that this is only the first half of the battle for Secon (even if Indiana

law would allow it to reach the assets of IRL's shareholders, it's making a claim against assets of a *creditor* of IRL), we turn to the question of liability of IRL's investors.

The general principle of investors' limited liability for the consequences of corporate acts developed in the United States during the early years of the nineteenth century, and despite occasional experiments with corporation statutes passing liability through to shareholders, by 1860 shareholders were protected against recovery by tort and contract claimants. Blumberg, **Corporate Groups** at § 1.04.6. Some form of limited liability (in the form of insurance if not legal protection) is important to large, publicly-held commercial enterprises that depend on the combination of large amounts of capital with the specialized skills of managers and workers who lack capital. Without such protection the gains from specialization would be eroded by the need for capital providers to monitor their enterprises closely, an activity to which they are not particularly suited, and by reductions in the liquidity of the markets for business enterprises. But of course shareholders have never escaped all sources of liability, under all possible circumstances. The exceptions to limited liability are at the heart of this case.

Analysis of the scope of these exceptions sometimes appears dominated by metaphor or epithet rather than by logic. Blumberg, **Corporate Groups** at § 6.01. But some points stand out, among them that it is a lot harder to hold investors personally liable in contract disputes than for tort judgments. *Id.* at § 6.07; see also, e.g., *Edwards Co. v. Monogram Industries, Inc.*, 730 F.2d 977, 980–84 (5th Cir.1984); *Brunswick Corp. v. Waxman*, 599 F.2d 34 (2d Cir.1979). The reason is simple: contract creditors have entered into a voluntary arrangement with the corporation, which gave them an opportunity to negotiate terms reflecting any enhanced risk to which doing business with an entity enjoy-

---

**6.** The pertinent count of Secon's complaint asserts only that "defendants were joint adventurers with St. Abbs and/or IRL ... upon the agreement of sale". The other theories were argued below, and decided by the district court, so we consider them as well.

ing limited liability exposed them. If they wanted guarantees from the investors, they could have negotiated for them. Tort creditors had no chance to obtain compensation ex ante for exposure to increased risk, so to cut off all liability might encourage excessively risky behavior. *United States v. Jon–T Chemicals, Inc.*, 768 F.2d 686, 693 (5th Cir.1985). Cf. *Consumer's Co-op of Walworth County v. Olsen*, 142 Wis.2d 465, 419 N.W.2d 211, 216 (1988) (the distinction between tort and contract claims should not affect the criteria used to determine whether the corporate entity should be disregarded; instead it should be considered in deciding whether the contract claimant has waived any right to reach investors, or should be estopped from attempting to do so); Richard A. Posner, *The Rights of Creditors of Affiliated Corporations*, 43 U.Chi.L.Rev. 499, 521 (1976) (same).

"Indiana courts are reluctant to disregard corporate identity and do so only to protect innocent third parties from fraud or injustice when transacting business with a corporate entity." *Extra Energy Coal Co. v. Diamond Energy and Resources, Inc.*, 467 N.E.2d 439, 441–42 (3d Dist.1984). When must innocent third parties be protected? Courts in Indiana and elsewhere typically rely on long lists of factors, including such things as inadequate capitalization, disregard of corporate formalities, day-to-day control by shareholders, concentration of stock ownership, commingling of receipts, and so forth. See, e.g., *Steven v. Roscoe Turner Aeronautical Corp.*, 324 F.2d 157, 161 (7th Cir.1963) (listing eleven factors gleaned from Indiana law, as noted in *Van Dorn*, 753 F.2d at 570, and *Old Town Development Co. v. Langford*, 349 N.E.2d 744, 777–78 (2d Dist.1976), transferred and dismissed as moot after settlement, 369 N.E.2d 404 (Ind.1977)); David H. Barber, *Piercing the Corporate Veil*, 17 Willamette L.Rev. 371, 374–75 (1981) (enumerating nineteen factors mentioned in cases from various jurisdictions). Indiana courts consider the same sorts of factors in both tort and contract cases. Such an approach, requiring courts to balance many imponderables, all important but none dispositive and frequently lacking a common metric to boot, is quite difficult to apply because it avoids formulating a real rule of decision. This keeps people in the dark about the legal consequences of their acts, a result that is bad enough in one-of-a-kind fact situations like torts but that is surely worse in situations like this, where the unknowable "rule" may affect every contract any Indiana corporation may undertake. See *Secretary of Labor v. Lauritzen*, 835 F.2d 1529, 1539–40 (7th Cir.1987) (concurring opinion).

Ordinarily the price of this sort of approach is commitment of the decision to the finder of fact, *id.* at 1539, so that summary judgment would be inappropriate,[7] unless it seems certain a trial would reveal no further meaningful evidence. Secon contends that summary judgment is improper here, because it has presented evidence creating a genuine issue of fact about the Bank's control of Nogg and IRL, and control almost invariably appears among the factors considered in alter ego cases. Nevertheless Indiana courts sometimes grant summary judgment in cases like this. *Lafayette Bank & Trust Co. v. Price*, 440 N.E.2d 759 (1st Dist.1982); see also *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). If Secon's evidence is so thin that it could not lead any reasonable fact finder to conclude that the Bank controlled IRL, or if other circumstances make control immaterial (that is, non-dispositive), summary judgment is possible.

The peculiar chumminess of the principal actors in this case gave Secon a better opportunity to demonstrate the Bank's control of its debtor than most disappointed creditors receive. The Bank contends that Nogg, as one of Secon's principal creditors, might benefit from its victory in this action. Perhaps for this reason, instead of claiming independence as an ordinary own-

---

7. But see *Craig v. Lake Asbestos of Quebec, Ltd.*, 843 F.2d 145, 148 (3d Cir.1988) (under New Jersey law, decision to disregard the corporate entity is a legal conclusion subject to plenary review on appeal).

er of a close corporation would do in his position, Nogg has enthusiastically supported Secon's theory by submitting a great deal of testimony saying that the Bank dictated his every move, using leverage provided by its personal loans to Nogg and the influence of its two representatives on the Boards of Directors of St. Abbs and Indiana Refrigerator Lines (Rosenthal and Raitzin). Noonan, offering his "expert opinion on financial matters", said he certainly thought the Bank was able to tell Nogg what to do. This, in Secon's view, created a genuine issue of material fact, precluding summary judgment.

Despite conditions that should have facilitated a demonstration of the Bank's control, if such existed, Secon's analysis contains a hole big enough to accommodate one of IRL's semitrailers. In late September 1980, only three months after the Bank "forced" Nogg into the Secon deal, Nogg was able to repudiate an already-signed refinancing arrangement with the Bank that would have placed in its hands a majority of St. Abbs's stock. At the same time, he engineered the resignation of Rosenthal and Raitzin from the Boards of Directors of St. Abbs and Indiana Refrigerator Lines, and redeemed the 25% of St. Abbs's stock the Bank owned. Only a period of worsening financial troubles separated this shakeup from the purchase of the operating authorities; surely these troubles would have strengthened rather than weakened any hold the Bank had over IRL in June. Secon ignores these key events, denying us the benefit of any explanation for them bar the obvious one: that the Bank never controlled IRL. No other inference is reasonably possible.

Secon contends that it was unfairly surprised by the district court's holding that the Bank didn't control IRL; Secon thought the Bank's control so self-evident as to be uncontested. We find this unconvincing. In Secon's view control is the *only* fact it needs to prove in order to enable the district court to disregard IRL's corporate existence. Thus Secon's contention that the district court's ruling on that issue took it by surprise amounts to a claim that it expected the district court to ignore all evidence, no matter how overwhelming, that is inconsistent with its counsel's conclusory factual assertions about an element essential to its case. This is not the meaning of Fed.R.Civ.P. 56(c). *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

Even if we were to ignore the events of September 1980 and accept that the Bank controlled IRL, Indiana law would not leave us any way to disregard IRL's corporate status. If control alone were sufficient, there would be no meaningful distinction between affiliated corporations; yet Indiana courts recognize their separateness. See, e.g., *Extra Energy; Burger Man, Inc. v. Jordan Paper Products, Inc.*, 170 Ind.App. 295, 352 N.E.2d 821 (1st Dist. 1976). Shareholder or parent corporation control is only one of the elements required, and Secon's only other evidence is the fact that the Bank eventually stopped throwing good money after bad and chose to enforce its security interests. In contract cases Indiana courts always have required more than control to pierce the corporate veil for the benefit of contract creditors like Secon, leading to disregard of the corporate entity only in such situations as *State v. McKinney*, 508 N.E.2d 1319, 1321 (3d Dist.1987) (the sole shareholder commingled corporate funds with his own and failed to engage an attorney to represent the corporation, as required by Indiana law); *General Finance Corp. v. Skinner*, 431 N.E.2d 526 (1st Dist.1982) (the corporation used the same firm name as its parent or sole shareholder); *Clarke Auto Co. v. Fyffe*, 124 Ind.App. 222, 116 N.E.2d 532 (1954) (same); *Urbanational Developers, Inc. v. Shamrock Engineering, Inc.*, 175 Ind.App. 416, 372 N.E.2d 742 (3d Dist.1978) (the subsidiary never had any assets at all, never paid any taxes, and its books were completely blank); and *Burger Man* (the parent made the contract creditor an explicit promise to support the subsidiary). There is an excellent reason for requiring something more than control: unless the corporation engaged in some practice that might have misled its contract creditors into thinking they were dealing with anoth-

er entity, there simply is no need to "protect" them. Unlike tort claimants, they chose to deal with the corporation; to allow them access to shareholders or parent corporations when the deal goes sour is to give them more than the benefit of their bargain. The additional evidence Indiana courts require goes to the possibility that contract creditors might have been unable to determine with whom they were dealing. Where there is no such possibility, Indiana courts refuse to hold investors liable. See, e.g., *Extra Energy*, 467 N.E.2d at 441 (separate corporate identity upheld in the absence of evidence that the contract creditor "was in any way deceived as to with whom it was dealing"); *Hinds v. McNair*, 235 Ind. 34, 129 N.E.2d 553, 559 (1955) (purchase of real estate from corporation with distinct name does not give rise to investor liability). See also *Brunswick* and *Jon–T Chemicals*.

Secon does not claim it was deceived into thinking the Bank was in the trucking business. Indeed it could not plausibly do so, because federal law forbids banks to engage in all but a few non-banking activities, see, e.g., 12 U.S.C. §§ 24, 1843 and 1863, and carrying meat and potatoes is not among them. Nor can Secon deny it knew it was dealing with IRL, when its chief negotiator, Wisehart, had served on the Board of Indiana Refrigerator Lines before its purchase of the operating authorities and was privy to IRL's continuing difficulties in obtaining adequate capital. Secon admitted that it knew IRL could not afford *any* up-front payment for the operating authorities. Secon's designated representative, Bertram J. Smith, said in Secon's deposition: "I asked Mr. Nogg whether IRL intended to put up any front money. He pointed out that the start-up costs would be high and that they didn't intend that." Secon's evidence boils down to incredible allegations of control coupled with failure to recapitalize. We have rejected the former, and we are unaware of any decision relying on undercapitalization alone as grounds for disregarding the corporate entity in a contract case. See William P. Hackney and Tracey G. Benson, *Shareholder Liability for Inadequate*

*Capital*, 43 U.Pitt.L.Rev. 837, 885 (1982). Moreover undercapitalization, when considered at all, is evaluated with emphasis on the time of incorporation rather than thereafter. See, e.g., *Consumer's Co-op*, 419 N.W.2d at 218–19; *DeWitt Truck Brokers v. W. Ray Flemming Fruit Co.*, 540 F.2d 681 (4th Cir.1976). A requirement to provide continuing capitalization, as Secon urges, probably would injure noncontrolling creditors, rather than helping them, by precipitating unnecessary forced sales. See Robert C. Downs, *Piercing the Corporate Veil—Do Corporations Provide Limited Personal Liability?*, 53 UMKC L.Rev. 174, 186–89 (1985). Moreover, it would increase the cost of credit, which would especially hurt start-up firms, a major source of innovation and competition.

## B

Secon originally presented its argument in the form of a claim that the Bank and IRL were "joint adventurers" liable for each other's debts. "A joint venture is an association of two or more persons formed to carry out a single enterprise for profit". *Boyer v. First National Bank of Kokomo*, 476 N.E.2d 895, 897 (Ind.App. 4th Dist. 1985). Such an association may be inferred from conduct. *Lafayette Bank*, 440 N.E. 2d at 762. "A joint venture exists when an express or implied contract providing for (1) a community of interests, and (2) joint or mutual control, that is, an equal right to direct and govern the undertaking, binds the parties to such agreement.... The joint venture must provide for sharing of profits but it need not distribute them equally." *Boyer*, 476 N.E.2d at 898. Secon contends that the Bank controlled Nogg, and through him IRL; the district court found that, as IRL's creditor, the Bank shared profits "indirectly". But these facts do not establish a joint venture. Secon insists that "[t]he Bank's position as a chief lender to IRL and to Mr. Nogg as well, coupled with its representation on IRL's Board of Directors and control over the corporate funds ... effectively put the Bank *in control of IRL for all purposes*" (emphasis added); "[t]he Bank was effec-

tively in control of IRL at the time the transaction with Yale/Secon was approved". This utterly fails to show "an equal right to direct and govern the undertaking", one of the necessary characteristics of a joint venture, according to *Boyer*, which actually grounded its conclusion that a written contract established a joint venture on its finding that *"both* parties had a right to control the enterprise." 476 N.E.2d at 899–900 (emphasis in original). If this sort of control establishes a joint venture, every parent corporation is a joint venturer with its subsidiaries, and every majority shareholder is a joint venturer with his corporation. This would eliminate, in a great number of instances, the protection from liability afforded by the corporate form. Yet "Indiana courts are reluctant to disregard the corporate entity". *McKinney*, 508 N.E.2d at 1320. Secon's theory would change reluctance to eagerness.

Even if Secon had established that the Bank enjoyed an "equal right" to control IRL's use of the operating authorities, we doubt whether the "indirect" sharing of profits (in the form of repayment of loans on a fixed schedule) would constitute the sort of profit sharing required for a joint venture. A creditor who contributes capital and secures his contribution with a note can be a joint venturer, but only "[w]here it is the intent of the parties for all co-venturers to be subject to the risks of the business". *Boyer*, 476 N.E.2d at 898. Creditors are not residual claimants; they are not normally regarded as "subject to the risks of the business" in the sense owners suffer those risks. Uncontradicted evidence in this case reveals that the Bank took virtually every step open to it in an effort to reduce or eliminate its exposure to the risk of IRL's insolvency. In fact, this dispute arose from the Bank's successful invocation of one such risk-avoidance mechanism: its security interests in IRL's accounts receivable and other assets. Nothing could be further from an intent to share the risks of IRL's business, something the Bank was forbidden to do anyway. See *Atlanta Shipping Corp. v. Chemical Bank*, 631 F.Supp. 335 (S.D.N.Y. 1986), *aff'd*, 818 F.2d 240 (2d Cir.1987); *Cantieri Navali Riuniti v. M/V Skyptron*, 621 F.Supp. 171 (W.D.La.1985), *aff'd*, 802 F.2d 160 (5th Cir.1986).

C

■ Secon also tries to make IRL out as the Bank's agent. Indiana recognizes three forms of agency relationships: actual agency, apparent agency, and agency by estoppel. *Hope Lutheran Church v. Chellew*, 460 N.E.2d 1244, 1247 (1st Dist.1984). Secon does not explain which of these theories it is advancing. It cites the **Restatement (Second) of Agency** § 140 (1958), but that merely points out that a creditor who assumes control of his debtor's business *may* thereby make the debtor his agent if the other requirements of agency are satisfied. Paragraphs 8 and 9 of Secon's Complaint assert that the Bank controlled IRL and accuse it of "[d]irectly inducing third persons, including plaintiff, to deal with [IRL] on the basis of false and misleading representations". We presume Secon meant to allege an apparent agency or an agency by estoppel.

Apparent agency requires control by the principal, acquiescence by the agent, and a "manifestation ... made by the principal to a third party who in turn is instilled with a reasonable belief that another individual is an agent of the principal. ... [S]tatements made by the agent are not sufficient to create an apparent agency relationship." *Hope Lutheran Church*, 460 N.E.2d at 1248. Estoppel additionally requires false representations of material facts by the principal with an intent to induce reliance by the third party, coupled with a resulting actual change in the third party's position. *Kokomo Veterans, Inc. v. Schick*, 439 N.E. 2d 639, 643 (3d Dist.1982).

Possibly because of the obscurity of Secon's pleadings, the district court did not directly address the Bank's potential liability as IRL's agent apart from Secon's fraud claims. On appeal, Secon incorrectly contends that control alone is sufficient to create an agency under § 140 of the **Re-**

statement.[8] To the contrary, some representation by the Bank to Secon, on which a reasonable person in Secon's position would rely, is a sine qua non of this theory. The district court correctly found that all communication between IRL and Secon passed through Nogg. In the purchase agreement itself Secon agreed that "[n]o promises, representations, warranties, guarantees or agreements not contained herein shall have any force or effect." Because the Bank didn't make any representations to Secon, it didn't vest Nogg or IRL with apparent authority to bargain on its behalf. Such an inference would have been particularly unreasonable in light of banking regulations forbidding the Bank to operate a trucking business.

Secon contends the Bank did make direct statements to it, promising to support IRL. It cites an extraordinary deposition in which Wisehart examined Nogg about statements Rosenthal, the Bank's Chairman and CEO, made in negotiations leading up to Nogg's purchase of IRL in 1979.

> Wisehart: I'm asking whether prior to the signing of the agreement, as an inducement for signing the agreement, anyone from the bank made statements about providing necessary working capital.... And at that time, prior to the signing of that agreement, I was present, was I not?

. . . .

> Nogg: To finish the answer to the question that you gave, Mr. Wisehart, the fact that you were present—and I don't have to refresh your memory—it was at that very meeting that Mr. Rosenthal very emphatically told us that money would be available and you heard that—
>
> Wisehart: Right.
>
> Nogg: —and I don't need to refresh your memory on that.

This conversation took place before Wisehart doffed his IRL hat—at the time, he was a prospective Board member of IRL. Certainly he was not then acting in his later role as Secon's counsel (he did not resign from the Boards of St. Abbs and Indiana Refrigerator Lines in order to take up that role until January 1980), so whatever Rosenthal said to him at this meeting was not a representation to Secon.[9] Nogg's testimony about it is hearsay in any event, and Fed.R.Civ.P. 56 demands admissible evidence. *Friedel v. City of Madison*, 832 F.2d 965, 970 (7th Cir.1987). Rosenthal was deposed, but the parts of his deposition included in the record on appeal do not address this question, and Secon has not identified any of his testimony that might pertain to this subject.

---

8. Control and agreement between the principal and agent would suffice to establish an actual agency, see *Hope Lutheran Church*, 460 N.E.2d at 1247, but Secon has not adduced any evidence of consent on the Bank's part to representation by IRL. All of the affidavits submitted by Secon address only attempts to assert control, and alleged acquiescence on Nogg's part. In any event, not even a generous reading of Secon's pleadings and arguments encompasses a theory of actual agency.

9. Mr. Wisehart's recollection of this conversation may be adequate, but perhaps he ought to refresh his memory of the standards of professional responsibility under which he practices. DR 5-101(B), which was in effect in both New York state and in the Northern District of Indiana at the time this deposition was taken, states: "A lawyer shall not accept employment in contemplated or pending litigation if he knows or it is obvious that he or a lawyer in his firm ought to be called as a witness", unless his testimony would relate to an uncontested or purely formal matter. This matter involved a key evidentiary point for Wisehart's client, Se-con, as well as a matter of some importance to a firm on whose board Wisehart served. DR 5-102 probably would have required Wisehart to withdraw before trial; so far he has not indicated any intent to do so, cf. *Culebras Enterprises Corp. v. Rivera-Rios*, 846 F.2d 94, 99 (1st Cir.1988), and now he is in the very position these rules were designed to prevent: that of arguing the credibility of his own testimony (or at least of leaving us wondering about his failure to present it, rather than relying on Nogg's hearsay account of what Rosenthal told Wisehart). ABA Model Rule 3.7, adopted by the Supreme Court of Indiana in 1987, and automatically effective in the Northern District of Indiana at that time because of Rule DE-IV of that court's Local Rules, "consolidates" DR-5-101(B) and 5-102. Wisehart's responsibilities under the Model Rules were essentially the same, if he intended to act as trial counsel. Had this case actually reached the trial stage, Wisehart would have been obliged to rethink his position.

Secon argues that Nogg misinformed it about IRL's financial health because the Bank misled Nogg, but this line of argument depends on the theory that Nogg himself was the Bank's agent, a theory Secon supports solely by reference to Nogg's own statements. "The representations of the agent will not suffice, for it is the 'well established rule that agency cannot be proven by the declarations of the agent, alone.' " *Storm v. Marsischke*, 159 Ind.App. 136, 304 N.E.2d 840, 843 (2d Dist. 1973), quoting *Pan American World Airways, Inc. v. Local Readers Service*, 143 Ind.App. 370, 240 N.E.2d 552, 556 (1st Div. 1968). Indeed, in *Storm* even the supposed agent's use of the alleged principal's company car, coupled with efforts to mediate disputes between the alleged principal and the third party, didn't suffice to establish an agency relationship. Here the Bank didn't allow any such implicit representations of Nogg's authority. Secon has simply failed to provide any evidence of representations by the Bank that Indiana law will accept as evidence of apparent authority. As the requirements for agency by estoppel are even more stringent, including scienter on the principal's part, *Hope Lutheran Church*, 460 N.E.2d at 1251, there was no agency by estoppel either.

Without explaining the basis of its conclusion, the district court noted that "[t]here is evidence that reasonably leads to the inference that promises of future financial support were made by the Bank." Apparently this referred to statements the Bank made to Nogg, or to Nogg and Wisehart while Wisehart was not wearing his Secon hat. These statements are irrelevant to the question of IRL's apparent authority because they were not made to Secon. Anyway, Nogg's previously-quoted description of these statements, the only information available about them, certainly does not suggest the Bank promised anything more than to consider future IRL loan requests on their merits. There was no promise of support come hell or high water, either by Rosenthal or Nogg (Smith said Nogg only "assured [Secon] there would be working capital"). We doubt that such statements could vest IRL with appar-

ent authority, because a reasonable person in Secon's position would not have relied on them in light of the disclaimer in the purchase agreement itself. See *Industrial Dredging & Engineering Corp. v. Southern Indiana Gas & Electric Co.*, 840 F.2d 523 (7th Cir.1988) (Indiana law respects written, contractual allocations of risk). Secon does not even discuss this provision of the purchase agreement, let alone offer any reason why the parol evidence rule should be disregarded to allow introduction of evidence controverting it. The district court's conclusion that IRL was not the Bank's agent was correct.

## IV

■ There is little of substance to Secon's remaining complaints. Second claims the Bank defrauded it by projecting a false impression that IRL would remain solvent. If the Bank made any such representations, they were only predictions, and in Indiana "fraud is a material misrepresentation of *past or existing* facts ... which cause reliance upon those representations to the detriment of the person so relying." *Vaughn v. General Foods Corp.*, 797 F.2d 1403, 1411 (7th Cir.1986) (emphasis added). Despite an opportunity to plead the facts underlying this claim more explicitly, as Fed.R.Civ.P. 9(b) requires, the only representation by the Bank to Secon that the latter has documented occurred at the December 1979 conference with Wisehart, who was not acting for Secon at the time. Given Secon's written admission in the purchase agreement itself that it was not relying on any promises outside the agreement, which makes the remarks non-material, the Bank's remarks in December 1979 certainly are no more than "a scintilla of evidence" insufficient to defeat the motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).

On appeal, both Secon and the Bank devote a great deal of attention to dealings between the Bank and Nogg associated with Nogg's initial decision to purchase IRL. We pass over this evidence, including the dispute about the significance of the

Price Waterhouse report, as irrelevant to whether Secon was defrauded; Secon wasn't involved in this transaction and could hardly have suffered from it. If there was no fraud, there was no conspiracy to defraud.

■ Because Secon hasn't proved the Bank committed any of the required predicate acts, the RICO complaint must be dismissed too. 18 U.S.C. § 1961(5). It was fatally defective anyway, because it was grounded solely on the sale of the operating authorities, and a single, isolated transaction does not satisfy the RICO requirement of a "pattern" of racketeering activity. *Skycom Corp. v. Telstar Corp.*, 813 F.2d 810, 818 (7th Cir.1987).

AFFIRMED.